[No. 3633.   Decided April 8, 1901.]

CITY OF NEW WHATCOM, *Defendant and Appellant,* v. FAIRHAVEN LAND COMPANY, *Plaintiff and Respondent.*

WATERS AND WATERCOURSES — DIVERSION FOR MUNICIPAL PURPOSES — RIGHTS OF RIPARIAN PROPRIETOR.

The right which a lower riparian proprietor has to the usual and undiminished flow of the water in the stream running through or by his land is property, of which he cannot be deprived without the exercise of the power of eminent domain and the payment of just compensation, even where the upper proprietor is a municipal corporation which seeks to divert the waters for a necessary public use.

Appeal from Superior Court, Whatcom County.—Hon. JESSE P. HOUSER, Judge.   Affirmed.

*C. H. Hurlbut, T. E. Cade* and *O. B. Barbo,* for appellant.

*Kerr & McCord,* for respondent.

The opinion of the court was delivered by

WHITE, J.—This action was originally instituted in the district court of the Territory of Washington on the 8th day of August, 1889, by the Fairhaven Land Company, as plaintiff, against the Bellingham Bay Water Company,

as defendant. The object of the action was to restrain and enjoin the Bellingham Bay Water Company, as a private corporation engaged in the business of supplying the inhabitants of the town of Whatcom with water for general domestic and municipal use, from diverting the waters of Whatcom creek from its natural bed for that purpose. Whatcom creek is the only outlet of Lake Whatcom, and flows from said lake, which is situated about three miles to the southeastward of its outlet, in a fixed and well defined channel, and has a fall from the lake of three hundred eighteen feet, and is not in any sense a navigable stream. Lake Whatcom is the source of Whatcom creek, and is a large, navigable, fresh-water lake, with an area of about seven and one-half miles, or about 5,000 acres, and is a meandered lake. Whatcom creek empties into Bellingham Bay, a part of Puget Sound. In the descent of the creek to Bellingham Bay there are a series of falls, the last of which is about twenty-five feet in height and the bottom of which is on a level with the tidal waters of Bellingham Bay. This last waterfall is immediately below a milldam used by the plaintiff in propelling a sawmill. There is a constant flow of water through the channel of the creek, which varies with the seasons. The capacity of the mill is about 75,000 feet of lumber per day. The natural flowage of the creek, undiminished by any diversion, is insufficient during the dry season of each year to operate the mill all the time. During the rainy season the flow of water through the creek aggregates about 100,000,000 gallons per day, and during the dry season the average flowage is from 5,000,000 to 8,000,000 gallons per day. To operate the sawmill and the water wheels connected therewith about 2,500,000 gallons per hour is required. In 1853 one Russell V. Peabody entered, under what is known as the "Donation Act," a part of the N. W.

¼ of the S. W. ¼ of section 30, township 38 north, of range 3 east. The plaintiff's mill is situated on a tract of land at the mouth of Whatcom creek, which is a part of the Peabody donation claim. The plaintiff is the owner of the lands at the mouth of the creek, and is the lowest riparian owner thereon, and its lands include the bed of the creek for a distance of about one-half mile upward from where the creek empties into Bellingham Bay. In the year 1854 Peabody and others associated with him erected on the tract now owned by the plaintiff a sawmill and operated it by water power from Whatcom creek until 1874, when the mill was burned down. In 1882 or 1883 the mill, owned by the plaintiff at the time this action was commenced, was built on plaintiff's land about fifty yards below the old mill site; the office of the new mill being about where the old mill stood. By mesne conveyances from the Peabody heirs and Peabody's associates and their grantees on the 8th day of May, 1889, the plaintiff became the owner of said mill and mill site and has been the owner ever since. The mill built in 1882 is also propelled by water from Whatcom creek. Whatcom creek flows through the Peabody donation claim and said mill tract. Subsequent to the institution of this action the Bellingham Bay Water Company, for the purpose of supplying the people of New Whatcom with water for domestic and municipal purposes, laid its water pipes and mains upon the streets of Whatcom and ran its mains up said Whatcom creek to a point about one-half mile from Lake Whatcom, and above the mill and lands of the plaintiff, and there connected its intake pipes and mains with the channel of said creek and diverted therefrom the water supply for said city of New Whatcom. The present population of New Whatcom is about seven thousand, and it is one of the growing and important cities of Puget Sound.

In 1893, and at the time the Bellingham Bay Water Company's intake pipes were connected with and were in the channel of Whatcom creek, the city of Whatcom purchased said water system from said Water Company; and thereafter the city of New Whatcom extended the water mains from where the intake pipes were located in said creek to and within Lake Whatcom proper and located the intake pipes, which were twenty-four inches in diameter, about one-quarter of a mile from the outlet of the lake, the head of Whatcom creek, placing such intake pipes about six feet below the bed of the creek at its source in the lake, and ever since has maintained said water system, and since such extension of the mains the water supply of New Whatcom has been taken directly from Lake Whatcom, and from no other source whatever. Said lake is the only practical source of water supply for the city of New Whatcom, and each year the necessities of the public and of the inhabitants of the city for supply of water is becoming more important and exacting. The city of New Whatcom has also entered into various contracts and leases with various of its citizens and inhabitants, by which it agreed to furnish and is furnishing such parties, through its water mains, water from Lake Whatcom for power purposes, to enable such parties to operate mills, printing presses, feed mills, electric light plants and various other machinery, and to supply docks, steamers, coal bunkers, etc. The water is also used by the city in operating public fountains, and for public buildings, and in flushing sewers, etc. After New Whatcom purchased said system, an amended complaint was filed in this action and the city of New Whatcom was made a party defendant, and the action was discontinued against the Bellingham Bay Water Company and the city of New Whatcom was substituted for the Bellingham Bay Water Company as

the sole defendant. Neither the Bellingham Bay Water Company nor the city of New Whatcom at any time instituted any action to condemn, nor have they at any time condemned, plaintiff's property, nor have they taken any action to secure the right to divert the waters of said Whatcom creek or of said Lake Whatcom for public or private use or for any other purpose, nor have they in any manner settled or attempted to settle or adjust any damages that plaintiff has or may suffer by reason of the diversion of said water. The Bellingham Bay Water Company, by lease or otherwise, was the riparian owner of the bed of said creek near the source thereof above the lands and mill site of the plaintiff at the time it put in its water system, and continued so up to the date of the sale of its system to New Whatcom, and the city of New Whatcom succeeded to whatever rights the water company had as such riparian owner; and the water company was a riparian owner on said creek above plaintiff prior to the date of the plaintiff's purchase of the mill and mill tract, and that fact was known to the plaintiff when it purchased. The city of New Whatcom has become the successor of the water company in supplying its inhabitants with water, and the value and use of the water system depends almost wholly upon a source of supply from said lake. If the supply was shut off the entire plant would be rendered valueless, and the people of the city would be greatly injured, and the public health might be endangered. The city of New Whatcom is situated on both sides of the creek, the full length of the creek from its source, taking in a part of Lake Whatcom and to its outlet. Streets and alleys are located and run across, parallel to, and upon the banks and bed of the creek; and the city of New Whatcom is the owner of property on the shores of the lake and in the bed of the creek at its source, and is a riparian owner

32-24 WASH.

on the lake and creek. By constructing a dam at the head
of the creek at the foot of the lake the surplus water of
the lake during the winter or wet seasons can be stored or
retained until the dry weather approaches, and can be
used during the summer to keep up and maintain the full
natural flowage of the creek during the entire season. It
is manifest from the evidence and findings in the case that,
by reason of the intake pipes of the water system being
laid in Lake Whatcom and the water drawn off thereby,
the natural flowage of Whatcom creek is greatly dimin-
ished, and that by reason thereof there is not sufficient
water at certain seasons of the year to operate the plain-
tiff's mill as the plaintiff might operate it but for the diver-
sion of the water through the intake pipes of the defend-
ant. The court below held that the diversion of any of the
waters from Lake Whatcom, under the water system of the
defendant, for the purpose of supplying water and power
to the various light plants, wood yards, printing offices,
etc., was in violation of the rights of the plaintiff, and
that the plaintiff being the lowest riparian owner on the
creek and having appropriated the flowage thereof for mill
purposes long prior to the attempted diversion of any of
the waters of said creek, or of Lake Whatcom, the source
of said creek, by the defendant or the water company, such
diversion by the defendant was in violation of the rights
of the plaintiff; and the court gave to the plaintiff a per-
petual injunction against the city of New Whatcom, en-
joining and restraining it from diverting any of the waters
of said creek, or the waters of said lake, the source of said
creek, for any purpose whatever, until such time as the
said city should compensate the plaintiff for any damages
accruing to it by reason of such diversion. From this
decree the city appeals.

The principal contention of the appellant is that the

state, under art. 17, § 1, of the constitution, is the sole and absolute owner of the bed, the shore to high water mark, and the waters of Lake Whatcom; that the state can use or divert, or authorize the use or diversion of, the waters in the lake for any public purpose; that to supply the inhabitants of a city with water is a public purpose and is a paramount necessity superior to every other use; that the state has authorized such use, and under such authorization the appellant is using the waters of the lake; and that the respondent has no interest in the waters of the lake.

The title to lands under tide waters in the sea, arms, and inlets thereof, and in tidal rivers, within the realm of England, was, by the common law, deemed to be vested in the king, as a public trust, to subserve and protect the public right to use them as a common highway for commerce, trade, and intercourse. The king, by virtue of his proprietary interest, could grant the soil so that it should become private property; but his grant was subject to the paramount right of the public use of navigable waters, which he could neither destroy nor abridge. In every such grant there was an implied reservation of the public right. Upon the American Revolution the title and dominion of the tide waters, and of the lands under them, vested in the several states of the Union within their respective borders, subject to the rights surrendered by the constitution to the United States. The new states admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands under them, within their respective jurisdictions. *Shively v. Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548); *Sage v. Mayor, etc., of New York,* 154 N. Y. 61 (47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592). Fresh-water lakes in England are private property, and the crown

and public possessed no such rights in fresh-water lakes as they possessed in tide waters. In navigable fresh-water rivers above the flow of the tide the bed of the river belonged to the owners of the adjacent soil to the middle of the stream. In this country the doctrine of private ownership has been generally recognized as the rule of the common law, but it has been held to be inapplicable to the condition of many of those states in which the inland rivers and lakes are large. The provision of art. 17, § 1, of the constitution was evidently for the purpose of establishing the right of the state to the beds of all navigable waters in the state, whether lakes or rivers, or fresh or salt, to the same extent the crown had in England in the sea, and in the arms and inlets thereof, and in the tidal rivers, and to eliminate the distinctions existing under the rule of the common law in this respect. Whatever rights the respondent possesses were acquired and became vested before the adoption of our state constitution. This court has decided that these rights are to be determined by the rule of the common law, so far as not repugnant to or inconsistent with the constitution and laws of the United States, or the organic act or laws of Washington Territory, or incompatible with the institutions and conditions of society in this state, and that the riparian owner is to be protected in the use and enjoyment of the water naturally flowing by or over his land, and, for the purpose of protecting the rights of a grantee of the government,—such as Russell V. Peabody and his grantees are in this case,— his title relates back to the first act necessary on his part in the proceedings to acquire title. *Benton v. Johncox,* 17 Wash. 277 (49 Pac. 495, 39 L. R. A. 107, 61 Am. St. Rep. 912). Section 16, art. 1, of the constitution expressly provides, that "No private property shall be taken or damaged for *public* or private use without just compen-

sation having been first made, or paid into court for the owner." Section 1. of·art. 17 of·the constitution, under. which the appellant claims that the state is the sole and absolute owner of the bed, the shore to high water mark, and the waters of Lake Whatcom, and can dispose of such waters as it sees fit, expressly protects all persons in asserting their claims to vested rights. That section reads as follows:

"The state of Washington asserts its ownership. to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: *Provided,* That this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

Though this section has the effect, as has been held by this court in *Eisenbach v. Hatfield,* 2 Wash. 236 (26 Pac. 539, 12 L. R. A. 632), and *Harbor Line Commissioners v. State,* 2 Wash. 530 (27 Pac. 550), of vesting in the state the entire and exclusive ownership of the beds and shores of all navigable waters, it should not be construed as affecting the rights of riparian proprietors upon non-navigable water courses, though their source is in navigable waters. The use of the water in such non-navigable streams is not inconsistent with the retention of the fee in the bed of navigable waters in the state. *Cocheco Co. v. Strafford,* 51 N. H. 455. The provisions of § 16, art. 1, of the constitution protect private property from confiscation for a *public* use; and the proviso to art. 17, § 1, clearly indicates that so far as rights had become vested, notwithstanding the other provisions of the section, the owner thereof should have the right to assert them in the courts; and, if this language means anything, it is that those rights should be protected and safeguarded by the courts.

In *Crook v. Hewitt*, 4 Wash. 749 (31 Pac. 28), this court quotes with approval from Gould on Waters (2d ed.), p. 396:

"The right to the use of the water in its natural flow is not a mere easement or appurtenance, but is inseparably annexed to the soil itself."

In *Rigney v. Tacoma Light & Water Co.*, 9 Wash. 576 (38 Pac. 147, 26 L. R. A. 425), it is said:

"The right to the use of water flowing over land is identified with the realty, and is a real and corporeal hereditament. . . . And this right is a substantial one, and may be the subject of sale or lease like the land itself."

In the two cases cited it is held that every riparian proprietor, in the absence of a grant, license, or prescription limiting his right, is entitled to have the stream which passes over or adjacent to his land flow as it is wont by nature, affected only in quantity or quality by the consequence of a reasonable use thereof by other proprietors, and that the riparian proprietor's right to the flow of the water is inseparably annexed to the soil, and passes with it, as a part and parcel of it. That a riparian proprietor may divert the water from the stream as it passes through his own land, without license from the proprietors above him, if he does not obstruct the water from flowing as freely as it was wont, and without license from the lower proprietors, if he restores the water to its natural channel before it enters their land and does not materially diminish its flow. The constitutional provision relied upon by the appellant does not in any way affect the rights of the respondent in the flowage of Whatcom creek as they existed in 1889, before the adoption of the constitution, when this action was instituted. The mere fact that the state owns the bed of Lake Whatcom has little, if any, bearing on the

diversion of the waters so that they cease to flow in What-
com creek; for, as we have said, the flow of the water in
the creek is not inconsistent with the retention by the state
of the fee in the bed of the lake.   The right of the state
over the waters of Lake Whatcom is such as pertains to
sovereignty alone.   That is the right to use, regulate, and
control these waters as a common highway for commerce,
trade, and intercourse, and to grant the soil in the bed
of the lake so that it might become private property, sub-
ject to the paramount right of public use for navigation.
In short, that the rights of the state in the navigable
waters thereof are the same rights as pertained to the
sovereign at common law in the sea, its bays, arms, and
inlets.   But conceding that by art. 17, § 1, of the consti-
tution absolute ownership is now in the state, so that the
state can dispose of the waters as well as the soil, the
vested rights of the respondent, notwithstanding, are pre-
served to it.   That is the right to the use of the water
in its natural flow as it existed before the adoption of the
constitution, when the United States granted to Russell
V. Peabody, under the "Donation Act," the land over which
Whatcom creek flows, of which the lands of the respondent
are a part.   The constitution having reserved to the re-
spondent its vested rights, the legislature, except under
the power of eminent domain, upon making compensation,
could not divest it of that right, either directly or indi-
rectly, for a *public* or private use.   *Yates v. Milwaukee,*
10 Wall. 497.   As was said by Justice MILLER in the case
last cited:

"This riparian right is property and is valuable and
though it must be enjoyed in due subjection to the rights
of the public it cannot be arbitrarily or capriciously de-
stroyed or impaired.   It is a right of which once vested,
the owners can only be deprived in accordance with estab-

lished law, and if necessary that it be taken for the public good upon due compensation."

As was said by the Missouri court of appeals in *Meyers v. St. Louis,* 8 Mo. App. 266:

"When it is settled that riparian rights are property,— and of this there seems to be no doubt,—the question as to the right to take them without compensation is at an end."

In *Mohr v. Gault,* 10 Wis. 513 (78 Am. Dec. 687),—a case where one undertook to cut a new channel so as to carry off the waters of a small lake by another way than through the usual outlet, on which the complainant's mill was situated,—it was held that the owners along the natural outlet had a legal right to the natural and usual flow of the water of the lake through such outlet.

The legislature of the state of New York had given a grant to the city of Rochester, authorizing it to enter upon, control and use the waters of Hemlock and Canadice lakes for the purpose of procuring a water supply for said city. These were large, fresh-water, navigable lakes, connected by a small stream; and Honeoye creek was their outlet, upon which was located Smith's water mills. Under legislative authority the city of Rochester proceeded to extract and carry away a part of the waters of these lakes, to the detriment of Smith. The city was enjoined, and the court of appeals held that the right to the usufructuary enjoyment of the undiminished and undisturbed flow which a riparian owner possesses in the case of non-navigable streams applies to fresh-water, navigable lakes, save that the public has an easement in such waters for the purposes of travel, as on a public highway, which easement, as it pertains to the sovereignty of the state, is inalienable and gives to the state the right to use, regulate, and control the waters for the purposes of navigation; and the right to

divert the waters for other purposes than navigation, although public in their nature, can only be acquired under and by virtue of the sovereign right of eminent domain, and upon making just compensation. *Smith v. Rochester,* 92 N. Y. 463 (44 Am. Rep. 393). Two lakes were the reservoirs from which a creek was fed. One sought to appropriate the waters of the lakes in such a manner as the quantity of the water flowing down the creek would be interfered with. Plaintiffs were riparian owners and appropriators of the creek. The supreme court of California says:

"If the tapping of these lakes by appellants reduces the amount of water to which plaintiffs are entitled, or shortens the period of time in which they might otherwise secure water from the creek, then the acts of appellants clearly are a trespass upon plaintiffs' rights,—exactly the same kind of trespass as though the creek was tapped, and that amount of water directly taken therefrom, without any molestation of the lakes." *Baxter v. Gilbert,* 125 Cal. 580 (58 Pac. 128).

Plaintiff was the owner of certain mills built on his own land, on the banks of the Cottonwood river. The mills were propelled by water power obtained by means of a dam across the river. The city of Emporia constructed a system of water works for the purpose of supplying the citizens with water for domestic use, for extinguishing fires, and for manufacturing purposes. It purchased a tract of land on the banks of the pond above the plaintiff's dam, dug a well twenty-five feet in diameter and twenty-six feet in depth on its own land, and from seventy to a hundred feet from the bank of the pond. This well drew its supply of water from the pond by percolation through a bed of gravel at the bottom of the well. The city sank one pipe into the well and another it extended directly into the pond; the latter to be used in case of fire. By means of en-

gines and pumps it supplied the citizens from the well with water needed for ordinary purposes. The supply of water in the river at certain seasons of the year was inadequate for running the mills, and the plaintiff was forced to suspend work and allow his mills to stand idle. Justice BREWER in delivering the opinion of the supreme court of Kansas on this state of facts, said:

"The amount of water now used by the city and its present effect upon the plaintiff's business do not determine the question of right or remedy. The continuance of the water works, as well as the growth of the city, will increase the demand; and, if the present abstraction can be sustained, there is no legal principle upon which the future and larger abstraction can be restrained. Now, that the flow of water in the natural channel of a surface stream is a property right of the riparian owner, is unquestioned and familiar law. (*Shamleffer v. Mill Co.*, 18 Kas. 24). If an individual should, by digging a new channel a few hundred feet above Soden's dam, attempt to divert the flow of the stream, beyond doubt he would be restrained. And this restraint would be granted, not because of the mere fact of digging a channel, but because thereby the natural flow of the stream was prevented; not because of the manner, but because of the fact of the diversion. The restraint would be granted as readily if the abstraction was by pipes and pumps, as if by channel and a change of current. The principle is this: That whatever of benefit, whether of power or otherwise, comes from the flow of water in the channel of a natural stream, is a matter of property and belongs to the riparian owner, and is protected in law just as fully as the land which he owns. It cannot be taken for private use except by his consent, and for public use only upon due compensation.

"With these general and conceded principles, let us now inquire as to the validity of the grounds upon which the action of the city is sought to be justified. The fact is obvious, that by means of the pipe running into the pond, there will be in case of fire a direct abstraction of water, and the fact is found that by means of the well there is

an indirect abstraction. The flow of water is, as heretofore stated, thus interfered with and the power diminished. It is in evidence that while at certain seasons of the year the water supply is more than enough for all of plaintiff's present uses, and that during such seasons the consumption of water in the city would work no present injury, yet at other seasons the supply is insufficient, and some, or all, of his mills are compelled to stop running. Hence, naturally, any substraction of the water would tend to increase the time during which his mills must be idle, and therefore work present and positive injury—an injury increasing with the increasing consumption by the city. Further, if plaintiff is entitled to this water power at all, he is entitled to all of it, and may increase the number of mills, or amount of machinery propelled by it, until his uses shall wholly exhaust it. So that matters of amount really fade out of sight, and the question is one of right and title." *Emporia v. Soden,* 25 Kan. 588 (37 Am. Rep. 265).

In the same case the city sought to justify the taking of the water as a riparian owner owning the lands above the plaintiffs. On this point Justice BREWER says:

"While the undiminished flow of the stream is conceded to be the right of every riparian owner, yet this right has always been limited to this extent, that each riparian owner may, without subjecting himself to liability to any lower riparian owner, use of the water whatever is needed for his own domestic purposes and the watering of his stock. The city is a riparian owner, and, whether it uses little or much, it is simply taking for domestic purposes. Each individual citizen of Emporia may buy land on the banks of the river and then take for domestic uses whatever amount of water he needs. What the individual separately may do, the city, representing all the individuals, has done. Does the manner in which the result was accomplished make any difference in the right?

This argument is plausible, but not sound. A city cannot be considered a riparian owner within the scope of the exception named. The amount of water which an individ-

ual living on the banks of a stream will use for domestic purposes, is comparatively trifling. Such use may be tolerated upon the principle *de minimis non curat lex.* It is a use which must always be anticipated, and may reasonably be considered as one of the benefits of the ownership of the banks of a natural stream. Every one proposing to utilize the power of running water should reasonably expect that the stream is chargeable with such a slight burden. It is only a fair equalization of rights. But the taking of water for the supply of a populous and growing city, stands upon an entirely different basis. No man can foresee this; and if it were tolerated, no one would dare to expend money in utilizing this power for fear of its being soon taken from him without compensation, and with total loss to his investment. The city, as a corporation, may own land on the banks, and thus in one sense be a riparian owner. But this does not make each citizen a riparian owner. And the corporation is not taking the water for its own domestic purposes; it is not an individual; it has no natural wants; it is not taking for its own use, but to supply a multitude of individuals; it takes to sell. Again, the statute under which the city is acting (Comp. Laws 1879, p. 997, § 1) authorizes the taking of water "for the purpose of supplying the inhabitants of such cities with water for domestic use, the extinguishment of fires, and for manufacturing and other purposes.' It would be strange if the city could destroy plaintiff's water power without compensation, and then sell it to other manufacturers, and thus build up rival establishments." *Emporia v. Soden,* supra.

See, also, *Stein v. Burden,* 24 Ala. 130 (60 Am. Dec. 453); *Garwood v. New York C. & H. R. R. Co.,* 83 N. Y. 400 (38 Am. Rep. 452).

It is not disputed in this case that the effect of the appellant's intake pipes, as laid into the lake, is simply to afford an additional channel for the outflow of the lake, and that respondent's mill is deprived of the amount of water by the city actually diverted. Now, no one can do indi-

rectly what the law will not permit him to do directly.
On this point, in the case of *Emporia v. Soden, supra,*
the court says:

"It is also a general proposition, that a man may not
do indirectly what he may not do directly. Unquestion-
ably, a party may not run pipes into plaintiff's mill-pond,
or dig a channel to it and thus divert the water. May
he accomplish the same result by digging a well upon the
very banks, and so near thereto that the water oozes out
from the pond into the well, and be beyond the reach of the
law so long as he keeps a wall of earth between the well and
the pond? If this were recognized as law, protection to
the owners of water power would rest on slender founda-
tions. Often the banks of a stream are composed of very
porous soil; or it may be there is, as in this case, a bed of
gravel through which the water runs as through a sieve.
Is the owner of the pond, then, at the mercy of any one
who, avoiding the more direct and public method of pipe
or channel, resorts to the equally effective means of ad-
jacent wells? And if a well on the very bank would be
restrained, may the same result be accomplished by digging
one a few feet off? It would seem as though but one
answer could in justice be given—that the owner of an
established power is entitled to protection against any sub-
straction therefrom, whether sought to be accomplished by
direct or indirect methods."

· The intake pipes of the appellant, twenty-four inches in
diameter, placed six feet below the bed of Whatcom creek,
a quarter of a mile from the outlet of the lake; through
which the appellant diverts the water that would otherwise
flow down the bed of the creek, certainly cause an indirect
diversion of the water from the bed of the creek to the
extent of the capacity of the pipe; and this diversion is
just as much a violation of the rights of the respondent as
if the pipe was in the bed of the creek above the respond-
ent's mill, where it was originally placed by the water com-
pany. The *Great Pond Cases* from Massachusetts and

Maine have no bearing upon this case; for, as the appellant says, the colonial ordinances of Massachusetts changed the common law as to great ponds in both those states. The cases from New York cited by appellant, on the Mohawk and Hudson rivers, grew out of the civil law prevailing in the Netherlands, under which titles were granted to the original settlers. *Smith v. Rochester,* 92 N. Y. 482 (44 Am. Rep. 393). The only case that the appellant has cited bearing upon the question here involved, and contrary to the authorities we have cited, and the views we have expressed, is from Minnesota,—the case of *Minneapolis Mill Co. v. Board of Water Commissioners,* 56 Minn. 485 (58 N. W. 33). In that case the appellants were a corporation created by acts of the territorial legislature and authorized to build and maintain dams in the Mississippi river, at the falls of St. Anthony, for the development of water power and for the use and sale of such power. Dams were erected and maintained under this authority forming such power. After this the legislature authorized the city of St. Paul to purchase, and there was purchased, the property and franchises of a private corporation theretofore engaged in supplying said city with water. Under the provisions of law the city extended this system and established a pumping station at Lake Baldwin, a body of water with an area less than a mile square, and by means of its pumps forced water through conduits to the city for public use. The outlet of this lake is Rice creek, and this creek empties into the Mississippi river a few miles above the dams built and maintained by appellants. The claim was that the result of this diversion was to greatly diminish the volume which came to the dam, and to materially affect and reduce the water power. The supreme court of Minnesota, in rendering their opinion, say:

"The plaintiffs are riparian owners on a navigable or public stream, and their rights as such owners are subordinate to public uses of the water in the stream, and their rights under their charters are equally with their rights as riparian owners, subordinate to these public uses.

"There can be no doubt but that the public, through their representatives, have the right to apply these waters to such public uses without providing for making compensation to riparian owners.

"The navigation of the stream is not the only public use to which these public waters may be thus applied. The right to draw from them a supply of water for the ordinary use of cities in their vicinity is such a public use, and has always been so recognized. At the present time it is one of the most important public rights and is daily growing in importance as population increases. . . .

"In thus taking water from navigable streams or lakes for such ordinary public uses, the power of the state is not limited or controlled by the rules which obtain between riparian owners as to the diversion from, and its return to, its natural channels. Once conceding that the taking is for a public use, and the above proposition naturally follows."

Not an authority is cited by that court to sustain these views. This case was appealed to the supreme court of the United States. That court held that the property rights of the plaintiff in error as riparian owners were to be measured by the rules and decisions of the state courts of Minnesota, and that none of the decisions of the state courts of Minnesota were inconsistent with the decision of the court in the case under review, and for that reason the supreme court of the United States affirmed the judgment. *St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners,* 168 U. S. 349 (18 Sup. Ct. 157).

That case has little, if any, bearing on the one under consideration; for the supreme court of this state, in cases

heretofore cited, has repeatedly held the rule to be other-
wise than that laid down by the supreme court of Minne-
sota. It may be conceded that at the time this action was
tried and judgment was entered, the city of New What-
com, under the law approved March 14, 1899. (Session
Laws, p. 250), authorizing municipal ownership of cer-
tain public utilities, had the right to take and appropriate
from Lake Whatcom an ample supply of water for all
uses and purposes, public and private, and that it had the
right to build dams or other works across the outlet of any
lake or water course for the purpose of storing and re-
taining water therein up to and above high water mark;
provided, that such dam did not obstruct, impede, or in-
terfere with navigation or other public uses; and provided
further, that, if any private property should be necessary
for such purposes, the same was to be condemned or pur-
chased. In this case, however, no steps have been taken
to condemn or purchase the property of the respondent
in the flow of Whatcom creek, which the appellant has
appropriated, and this is one of the very things the city
was required to do when exercising the powers conferred
on it by the act of 1899. Mr. Loggie, a lessee of the re-
spondent's mill, with the permission of the appellant, but
without permission or direction from the respondent, in
1899 (the year of the trial of this case), built a tempo-
rary dam at the outlet of the lake for the purpose of stor-
ing the water for use during the dry season. There is
testimony tending to show that by means of this dam a
sufficient quantity of water was stored in the lake for the
use of the appellant, and also the respondent's mill, during
the dry season of that year. We are at a loss to know why
this fact is urged against the correctness of the trial
court's decree. The city of New Whatcom is a large and
growing city, and it may need, under its water system, all

of the outflow waters of Lake Whatcom both summer and winter.

The question involved in this action is the right of the city to divert a part or all of these waters without compensating the respondent, the owner of this outflow at the mouth of the natural outlet. We hold that the judgment and decree of the court below was correct, and is fully sustained by reason and the decisions of this and almost all other courts, and for that reason the judgment must be affirmed subject to the modifications hereinafter indicated.

While it is no part of the office of the court to consider the ways and means by which the appellant may comply with the decree entered against it, yet, in this case, as a numerous population will be suddenly deprived of that which is essential to their health and existence if the decree is at once enforced, we modify the decree of the court below as follows: The said appellant shall have sixty days from the filing of this opinion to purchase from or otherwise arrange with the respondent for the use of said flowage, or, if such purchase or arrangement cannot be made, to commence proceedings in the superior court to condemn the property and rights of the respondent in Whatcom creek as indicated in this opinion. If condemnation proceedings are instituted within said time, then the injunction granted by the decree of the court below shall be stayed until the final determination of such condemnation proceedings; provided, such proceedings are prosecuted by the appellant with due diligence. The respondent to recover its costs in the court below and on this appeal.

FULLERTON and ANDERS, JJ., concur.

REAVIS, C. J., concurs on the ground that respondent made the first appropriation and use for a beneficial purpose.

33 24 WASH.

DUNBAR, J. I concur in the affirmance of the judgment but not in what is said in relation to the modification. The appellant can pursue its legal remedies, if it has any, like any other litigant, and the respondent is as much entitled to its legal remedy, unqualified by prescribed conditions, as though its adversary were an individual.