

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JUL 0 6 2017

CHIEF JUSTICE

This opinion was filed for record

at  8:00am  on July 6, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHELAN BASIN CONSERVANCY, | ) | No. 93381-2 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| GBI HOLDING CO., | ) | |
| STATE OF WASHINGTON, | ) | |
| and CITY OF CHELAN, | ) | |
| | ) | Filed ____ JUL 0 6 2017 ____ |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHELAN COUNTY PUBLIC | ) | |
| UTILITY DISTRICT, | ) | |
| | ) | |
| Additional Named Party. | ) | |
| | ) | |

GONZÁLEZ, J.—Petitioner Chelan Basin Conservancy (Conservancy) seeks the removal of six acres of fill material that respondent GBI Holding Co. added to its property in 1961 to keep the formerly dry property permanently above the artificially raised seasonal water fluctuations of Lake Chelan. The Conservancy brings this action pursuant to Washington's public trust doctrine, which protects the public right to use water in place along navigable waterways. At issue is whether the State consented to the

fill's impairment of that right and, if so, whether such consent violates the public trust doctrine.

As explained in this opinion, the Court of Appeals correctly concluded that the legislature consented to the fill's impairment of navigable waters under RCW 90.58.270 (the Savings Clause), but the Court of Appeals prematurely concluded such consent did not violate the public trust doctrine. Because the trial court never reached the highly factual public trust issue, we reverse and remand to the trial court to determine in the first instance whether RCW 90.58.270 violates the public trust doctrine.

## FACTUAL AND PROCEDURAL BACKGROUND

Our state constitution grants the State "ownership to the beds and shores of all navigable waters in the state." CONST. art. XVII, § 1 (article 17). We have interpreted this provision to mean the State possesses an alienable fee-simple private property interest in those beds and shores subject to an overriding public servitude to use the waters in place for navigation and fishing, and other incidental activities. *Caminiti v. Boyle*, 107 Wn.2d 662, 668-69, 732 P.2d 989 (1987). The parties agree that Lake Chelan is a navigable body of water and that GBI's property along the lake is subject to the public trust servitude.

In its natural state, GBI's property stood above the lake's peak water

levels and was continuously dry throughout the year. *See Wilbour v. Gallagher*, 77 Wn.2d 306, 307, 462 P.2d 232 (1969). In 1927, GBI's predecessor in interest granted a flowage easement over the property to a power company to install a dam that would artificially raise the lake waters. *Id.* at 307-08 (discussing covenants related to the construction of the dam). After the dam was installed, GBI's once permanently dry land became seasonally submerged by the lake's artificially elevated waters.

In 1961, GBI added fill to its property to elevate it once more permanently above the lake's seasonal fluctuations. The fill is locally referred to as "the Three Fingers" because it resembles, in aerial photographs, three rectangular fingers protruding into the lake.

Eight years after GBI filled its property, we held in *Wilbour*, a case involving a neighboring landfill abutting Lake Chelan, that the neighbor's fill violated the public trust doctrine and ordered the fill be abated. *Id.* at 315-16. Although we acknowledged the existence of other similarly situated fills along the lake, our *Wilbour* decision did not order their abatement. *Id.* at 316 n.13. Despite its limited disposition, *Wilbour* was publicly hailed as a watershed case that placed title to thousands of properties along Washington's shores in question. *See* 1 SENATE JOURNAL, 42d Leg., 1st Ex. Sess., at 1411 (Wash. 1971). That is because much of Washington's shores

3

and tidelands were improved during our early years of statehood, when private settlement and development were widely encouraged with little consideration given to the effect these developments would have on public trust rights. *See State v. Sturtevant*, 76 Wash. 158, 171, 135 P. 1035 (1913). By 1969, thousands of acres of Washington's tidelands and shorelands had been reclaimed and developed with significant improvements, including the creation of Harbor Island and much of downtown Seattle. Edward A. Rauscher, *The Lake Chelan Case—Another View*, 45 WASH. L. REV. 523, 531 (1970); *Port of Seattle v. Or. & W. R. Co.*, 255 U.S. 56, 59, 41 S. Ct. 237, 65 L. Ed. 500 (1921); Ralph W. Johnson & Eileen M. Cooney, *Harbor Lines and the Public Trust Doctrine in Wash. Navigable Waters*, 54 WASH. L. REV. 275, 289 n.64 (1979) (noting that the state had sold approximately 60 percent of its tidelands to private parties between 1889 and 1971) (citing DEP'T OF ECOLOGY, WASH. STATE COASTAL ZONE MGMT. PROGRAM 73 (1976)).

The legislature responded to the *Wilbour* decision by enacting the Savings Clause, RCW 90.58.270, that gave post hoc consent to pre-*Wilbour* improvements to protect them from public trust challenges. *See* 1 SENATE JOURNAL at 1411. The Savings Clause was enacted as part of a much broader piece of legislation known as the Shoreline Management Act of

1971 (SMA), chapter 90.58 RCW, and directly responded to our directive to the legislature in *Wilbour* that it, as trustee of public trust resources, was responsible for determining how best to preserve and promote the State's public trust interests. *See Wilbour*, 77 Wn.2d at 316 n.13.

The legislature referred the SMA to the people the following year for ratification. *State of Washington Voters Pamphlet, General Election* 34-35, (Nov. 7, 1972) (App. to Supp'l Br. of Resp't State of Wash.). The legislature presented the SMA to Washington voters along with an alternative measure, Initiative 43. *Id.* at 32-33. Although both the SMA and Initiative 43 established guidelines for the development of Washington's waterways and shorelines, one major difference between the two plans was how they treated pre-*Wilbour* fills. *Id.* at 108. The SMA provided legislative consent to pre-*Wilbour* fills; whereas Initiative 43 did not. *Id.* The people ratified the SMA and rejected Initiative 43 by a substantial margin. WASH. SEC'Y OF STATE, *Initiative to the Leg. No. 43* (General Election Nov. 7, 1972) (285,721 voters preferred Initiative 43, while 611,748 voters preferred the SMA). Following ratification of the SMA, little legal attention was given to pre-*Wilbour* fills.

The Three Fingers fill gained attention in 2010 when GBI submitted a permit application to the city of Chelan to develop the fill. GBI later

withdrew its application, following public opposition to the proposed development. Eventually, GBI submitted a second application; this time to subdivide the property into six short plats with no immediate plans for their development. The city approved the short plat application conditioned on the reservation of a public park and several public access points thereon. GBI appealed the city's conditional land use decision, but the appeal has been stayed pending resolution of this action.

Meanwhile, while GBI was going through the permitting and short plat process, a local environmental group, the Conservancy, filed this action against GBI, seeking the abatement and removal of the Three Fingers fill pursuant to the public trust doctrine and *Wilbour*.[1] The Conservancy additionally named as interested parties the city of Chelan, the State of Washington, and the owner of the dam, Chelan County Public Utility District.

GBI moved for summary judgment, arguing, among other things, that the Conservancy lacked standing to bring the present action and that any public trust claim seeking the removal of the Three Fingers was barred by the SMA's Savings Clause, RCW 90.58.270. The Conservancy moved for

---

[1] The Conservancy also asserted a trespass claim that is not at issue in this appeal. *Chelan Basin Conservancy v. GBI Holding Co.*, 194 Wn. App. 478, 484 n.1, 378 P.3d 222, *review granted*, 186 Wn.2d 1032, 385 P.3d 769 (2016).

summary judgment on the applicability of the Savings Clause and the public trust doctrine as well.

Regarding the justiciable question of standing, the trial court found the Conservancy had standing to raise its public trust claim. As for the Savings Clause and its interplay with the public trust, the trial court initially found the Savings Clause violated the public trust doctrine but later rescinded that decision, choosing instead to avoid the public trust question altogether by holding the Savings Clause did not apply. After finding the legislature never consented to the creation of the Three Fingers fill, the court ordered the fill be removed.

GBI appealed to the Court of Appeals, which reversed the trial court's order and remanded for further proceedings. *Chelan Basin Conservancy v. GBI Holding Co.*, 194 Wn. App. 478, 495, 378 P.3d 222 (2016). The Court of Appeals agreed with the trial court that the Conservancy had standing to sue but departed from the trial court's analysis regarding the applicability of the Savings Clause. *Id.* at 487-95. The Court of Appeals held the Savings Clause applied and its bar on public trust claims was enforceable since the Conservancy failed to prove the statute violated the public trust. *Id.* at 488-95.

The Conservancy petitioned this court for review of the Savings

Clause and public trust issues. In its answer, GBI requested pursuant to RAP 13.4(d) that if we grant review, we should also address the issue of standing. We granted review without limitation. *Chelan Basin Conservancy v. GBI Holding Co.*, 186 Wn.2d 1032, 385 P.3d 769 (2016). We therefore address three issues: (1) whether the Savings Clause, RCW 90.58.270, applies to the Three Fingers fill, (2) if so, whether the clause violates the public trust doctrine, and (3) whether the Conservancy has standing to bring this public trust action.

## WASHINGTON'S PUBLIC TRUST DOCTRINE

The public trust doctrine is an ancient common law doctrine that recognizes the public right to use navigable waters in place for navigation and fishing, and other incidental activities. *E.g.*, *Caminiti*, 107 Wn.2d at 668-69. The principle that the public has an overriding interest in navigable waterways and the lands underneath them has been dated by some jurists as far back as the Code of Justinian, which was developed in Rome during the 6th century. While there is some debate whether this attribution to Roman law holds water, it is generally accepted even among the most skeptical of critics that the public trust doctrine has a long history and was firmly ingrained in English and American common law by the 19th century. *See,*

*Chelan Basin Conservancy v. GBI Holding Co.*, No. 93381-2

e.g., James L. Huffman, *Speaking of Inconvenient Truths—A History of the Public Trust Doctrine*, 18 DUKE ENVTL. L. & POL'Y F. 1, 12-19 (2007).

Although the public trust doctrine originates from a common source, "'it has been long established that the individual [s]tates have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit.'" *State v. Longshore*, 141 Wn.2d 414, 427-28, 5 P.3d 1256 (2000) (quoting *Phillips Petrol. Co. v. Mississippi*, 484 U.S. 469, 475, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1988)); *Grays Harbor Boom Co. v. Lownsdale*, 54 Wash. 83, 104, 104 P. 267 (1909) (per curiam) ("'The whole question [regarding the scope of the public trust doctrine] is for the state to determine for itself.'" (quoting *Shively v. Bowlby*, 152 U.S. 1, 56, 14 S. Ct. 548, 38 L. Ed. 331 (1894))); *Sequim Bay Canning Co. v. Bugge*, 49 Wash. 127, 132, 94 P. 922 (1908) (recognizing each state's prerogative to define and decide how to protect or dispose of its public trust property). We therefore "look *solely* to Washington law" when determining the scope and application of our public trust rights and obligations. *Longshore*, 141 Wn.2d at 428.

Even though Washington's public trust right to use navigable waters in place is sometimes described as a right that can be "neither destroy[ed] nor abridge[d]," *New Whatcom v. Fairhaven Land Co.*, 24 Wash. 493, 499,

64 P. 735 (1901), this does not mean that the State must hold all the beds and shores of navigable waters inviolate. *Davidson v. State*, 116 Wn.2d 13, 16, 802 P.2d 1374 (1991); *Caminiti*, 107 Wn.2d at 668. Under article 17, "the state of Washington has the power to dispose of, and invest persons with, ownership of tidelands and shorelands subject only to the paramount right of navigation and the fishery." *Id.* at 667. This is because the State owns article 17 lands in two distinct capacities. *Longshore*, 141 Wn.2d at 427; *Caminiti*, 107 Wn.2d at 668-69; *Orion Corp. v. State*, 109 Wn.2d 621, 639, 747 P.2d 1062 (1987); *Eisenbach v. Hatfield*, 2 Wash. 236, 240-41, 26 P. 539 (1891).

First, as title owner, "the state holds full proprietary rights in tidelands and shorelands and has fee simple title to such lands" so that it "may convey title to [those lands] in any manner and for any purpose not forbidden by the state or federal constitutions and its grantees take title as absolutely as if the transaction were between private individuals." *Caminiti*, 107 Wn.2d at 668. This title interest is referred to as the State's jus privatum interest.

Second, because such land is also held by the State in trust and for the benefit of the people, any right conveyed generally remains subservient to the public right to use water in place for navigation, *see Hill v. Newell*, 86 Wash. 227, 231, 149 P. 951 (1915), much like "'a covenant running with the

land,'" *Orion*, 109 Wn.2d at 640 (quoting Scott W. Reed, *The Public Trust Doctrine: Is it Amphibious?*, 1 J. ENVTL. L. & LITIG. 107, 118 (1986)). This public servitude is referred to as the State's jus publicum interest.

Although title to property burdened by the public trust remains continuously subject to the servitude, the competing rights and interests of the public and private owner rise and fall with the water. "As the level rises, the rights of the public to use the water increase since the area of water increases; correspondingly, the rights of the landowners decrease since they cannot use their property in such a manner as to interfere with the expanded public rights." *Wilbour*, 77 Wn.2d at 315. "As the level and the area of the water decreases, the rights of the public decrease and the rights of the landowners increase as the waters drain off their land, again giving them the right to exclusive possession until their lands are again submerged." *Id.*

A private landowner whose lands are burdened by the public trust cannot unilaterally extinguish the public right to use navigable waters in place by artificially elevating his or her property above the high-water mark absent legislative consent. *Id.* at 314-16. GBI contends the legislature and Washington voters consented to the retention of the Three Fingers fill when the legislature enacted and the people ratified the Savings Clause. We agree.

11

I.     <u>Legislative Consent under the Savings Clause</u>

The Savings Clause, RCW 90.58.270, provides legislative consent to the impairment of public trust rights by pre-*Wilbour* improvements and bars private actions challenging that impairment *unless* the improvements were "in trespass or in violation of state statutes." RCW 90.58.270(1), (2). GBI argues that because the Three Fingers fill was created pre-*Wilbour*, the Savings Clause protects the fill and bars this action. The Conservancy disagrees. It argues the Savings Clause is inapplicable in this case because the Three Fingers fill "'obstruct[ed] or impede[d] . . . the passage of [a] river, harbor, or collection of water'" in violation of the public nuisance statute. Suppl. Br. of Pet'r Conservancy at 17 (quoting RCW 7.48.140(3)). According to the Conservancy, this public nuisance violation disqualified the Three Fingers fill from the protections of the Savings Clause since the fill was "'in violation of state statutes.'" *Id.* at 3 (quoting RCW 90.58.270(1)). GBI disagrees with the premise of the Conservancy's argument; that is, that the Three Fingers fill constitutes a public nuisance. To resolve this debate, we must construe the public nuisance statute as it relates to the Savings Clause.[2]

---

[2] The city of Chelan believes we can avoid this public nuisance question. The city contends that since the Savings Clause consents only to the "'retention and maintenance'" of existing structures, such consent does not extend to GBI's proposed

"Issues of statutory construction . . . are questions of law" subject to de novo review. *State v. Evans*, 177 Wn.2d 186, 191, 298 P.3d 724 (2013). "The purpose of statutory interpretation is to 'determine and give effect to the intent of the legislature.'" *Id.* at 192 (quoting *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012)). "'A statute that is clear on its face is not subject to judicial construction.'" *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 452, 210 P.3d 297 (2009) (quoting *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). "If the plain language is subject to only one interpretation, our inquiry ends because plain language does not require construction." *Id.* at 451. Typically, where an act has a doubtful or ambiguous meaning, it is the duty of the court to adopt a construction that is reasonably liberal, in furtherance of the obvious or manifest purpose of the legislature. *Evans*, 177 Wn.2d at 193; *State v. Rinkes*, 49 Wn.2d 664, 667, 306 P.2d 205 (1957). However, because we are dealing with a public trust impairment, albeit one passed directly by the people, the statute must be strictly construed in preservation of the public trust interest absent express contrary language or necessary implication. *See Hill*, 86 Wash. at 229

---

2010 developments, which in its view should end our analysis. Supp'l Br. of City of Chelan at 5-7 (quoting RCW 90.58.270(1)). The city misapprehends the Conservancy's claims. Although this litigation was triggered by GBI's development proposals, those proposals do not form the bases of the Conservancy's complaint. The Conservancy seeks the removal of the existing fill, not an injunction against future development. We therefore cannot avoid the public nuisance question, as the city suggests.

("'The general rule of construction applying to grants of public lands by a sovereignty to corporations or individuals is that the grant must be construed liberally as to the grantor and strictly as to the grantee, and that nothing shall be taken to pass by implication.'" (quoting 26 AMERICAN AND ENGLISH ENCYCLOPAEDIA OF LAW 425 (2d ed. 1904))); *City of Berkeley v. Superior Ct.*, 26 Cal. 3d 515, 528, 606 P.2d 362, 162 Cal. Rptr. 327 (1980) ("[S]tatutes purporting to abandon the public trust are to be strictly construed; the intent to abandon must be clearly expressed or necessarily implied; and if any interpretation of the statute is reasonably possible which would retain the public's interest in tidelands, the court must give the statute such an interpretation.").

RCW 7.48.140(3) declares it a public nuisance, among other enumerated actions, "[t]o obstruct or impede, *without legal authority*, the passage of any river, harbor, or collection of water." (Emphasis added.) Another statute further explains that "[n]othing which is done or *maintained under the express authority of a statute*, can be deemed a nuisance." RCW 7.48.160 (emphasis added). GBI and the State interpret the Savings Clause as providing the requisite legal and express statutory authority for the retention and maintenance of pre-*Wilbour* improvements on navigable

14

waterways to insulate them from any public nuisance claim based on that same impairment of navigable waters. We agree.

The Savings Clause provides legislative "consent and authorization" "to the impairment of public rights of navigation, and corollary rights incidental thereto, caused by the retention and maintenance of" "structures, improvements, docks, fills, or developments placed in navigable waters prior to December 4, 1969." RCW 90.58.270(1).[3] The only way for the Savings Clause to have any practical effect is to interpret it as giving pre-*Wilbour* improvements the requisite legal and statutory authority to impair navigable waters so they no longer violate the public nuisance statute. Otherwise,

---

[3] RCW 90.58.270 provides in relevant part:

(1) Nothing in this section shall constitute authority for requiring or ordering the removal of any structures, improvements, docks, fills, or developments placed in navigable waters prior to December 4, 1969, and the consent and authorization of the state of Washington to the impairment of public rights of navigation, and corollary rights incidental thereto, caused by the retention and maintenance of said structures, improvements, docks, fills or developments are hereby granted: PROVIDED, That the consent herein given shall not relate to any structures, improvements, docks, fills, or developments placed on tidelands, shorelands, or beds underlying said waters which are in trespass or in violation of state statutes.

(2) Nothing in this section shall be construed as altering or abridging any private right of action, other than a private right which is based upon the impairment of public rights consented to in subsection (1) of this section.

(3) Nothing in this section shall be construed as altering or abridging the authority of the state or local governments to suppress or abate nuisances or to abate pollution.

(4) Subsection (1) of this section shall apply to any case pending in the courts of this state on June 1, 1971 relating to the removal of structures, improvements, docks, fills, or developments based on the impairment of public navigational rights.

15

prior consent would be a necessary prerequisite for obtaining post hoc

consent under the Savings Clause. That reading is absurd and renders the

entire statute practically meaningless; we therefore avoid it. *State v.*

*Riles,* 135 Wn.2d 326, 340, 957 P.2d 655 (1998) ("Courts should not

construe statutes to render any language superfluous and must avoid strained

or absurd interpretations." (citing *Wright v. Engum,* 124 Wn.2d 343, 351-52,

878 P.2d 1198 (1994))). Worse, that reading would require us to construe

the statute's limited proviso exception so broadly that it swallows the

general rule entirely. *Wash. State Legislature v. Lowry,* 131 Wn.2d 309,

327, 931 P.2d 885 (1997) (Provisos "'should be strictly construed with any

doubt to be resolved in favor of the general provisions, rather than the

exceptions.'" (quoting *State v. Wright,* 84 Wn.2d 645, 652, 529 P.2d 453

(1974))).

The legislature undeniably intended the Savings Clause to foreclose

private actions for the removal of pre-*Wilbour* improvements based on their

impairment of navigable waters alone. As one of the prime sponsors of the

statute, Senator Gissberg, explained during a senate floor debate, the purpose

of the Savings Clause was to "make[] legal any fills that took place prior to

December 4, 1969," which is the date *Wilbour* was decided. 1 SENATE

JOURNAL at 1411. Senator Gissberg further explained the reasoning for and the intended effect of the Savings Clause as follows:

> Yes, I think in the entire section in subsection [(1⁴)], you are, the state of Washington is giving its consent to the impairment of public rights of navigation as to those structures, improvements, docks, fills or developments which were placed in navigable waters prior to December 4, 1969. And it is a savings clause for those structures that were placed there prior to Wilbour vs. Gallagher. If it is not there, then every dock, most of industry in the state that is on the water, of course, is there illegally and subject to mandatory injunction to being removed by anyone that wants to bring the lawsuit. Consequently, that is why the savings clause is there, and the state is giving, or purports to give its consent to the impairment of the navigable rights of the public generally which are impeded by the construction of those docks and facilities that are in navigable waters.

*Id.* We therefore interpret the Savings Clause as authorizing the retention and maintenance of the Three Fingers fill and barring private public nuisance claims based on the fill's impairment of navigable waters.[5] Unless that legislative authorization itself violates the public trust doctrine, the

---

[4] According to the Senate Journal, the senator said "subsection (3)," but that reference must have been a mistake or scrivener's error because subsection (3) addresses the authority of state and local governments to bring nuisance and abatement actions notwithstanding the legislative consent provided in subsection (1). *See* LAWS OF 1971, 1st Ex. Sess., ch. 286, § 27.

[5] We decline to address whether the Three Fingers fill is abatable as a public nuisance for reasons other than its impairment of navigable waters because that issue is not before us. The Conservancy has expressly disavowed bringing a public nuisance claim based on any reason other than the public trust. *Chelan Basin*, 194 Wn. App. at 492; Supp'l Br. of Pet'r Conservancy at 20 ("[T]his case was not brought as a nuisance action."). Nor has the Conservancy presented any facts that would trigger the application of *Grundy v. Thurston County*. 155 Wn.2d 1, 7 n.5, 117 P.3d 1089 (2005) ("'[E]ven though an act or a structure was lawful when made or erected, if for any reason it later becomes or causes a nuisance, the legitimate character of its origin does not justify its continuance as a nuisance.'" (footnote omitted) (quoting 66 C.J.S. *Nuisances* § 15, at 551-52 (1998))).

Conservancy's claims for the abatement of the Three Fingers fill based on the fill's impairment of navigable waters must be dismissed.

II.     The Legislature's Public Trust Obligations under *Caminiti*

Washington's public trust doctrine operates under the principle that "'[t]he control of the State for purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and water remaining.'" *Caminiti*, 107 Wn.2d at 670 (quoting *Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453, 13 S. Ct. 110, 36 L. Ed. 1018 (1892)); *Palmer v. Peterson*, 56 Wash. 74, 76, 105 P. 179 (1909) (adopting *Illinois Central*'s description of the public trust doctrine as consistent with Washington's public trust doctrine). This means the legislature can dispose of the public right to use navigable waters in place only to promote the interests protected by the public trust doctrine or to further some other interest if doing so does not substantially impair the public trust resource. 2 WATERS AND WATER RIGHTS § 30.02(d)(3), at 30-46 (Amy K. Kelley ed., 3d ed. 2013). Accordingly, when evaluating a public trust claim, we consider: "(1) whether the State, by the questioned legislation, has given up its right of control over the jus publicum and (2) if so, whether by so doing the State (a) has promoted the interests of the public

18

in the jus publicum, or (b) has not substantially impaired it." *Caminiti*, 107 Wn.2d at 670.

The answers to those questions are factually dependent. Because the trial court never reached *Caminiti*'s factual analysis, we reverse and remand to the trial court to decide the matter in the first instance. To assist the trial court on remand, we answer the following legal questions presented by the parties: (a) Is judicial review of the Savings Clause precluded by legislative preemption? (b) Who bears the burden of proving a legislative action violates the public trust doctrine? (c) Did the State abdicate control over the Three Fingers property when it enacted the Savings Clause? And finally, (d) what is the proper geographical focus for evaluating the interests affected by the Savings Clause under *Caminiti*?

### a. *Legislation That Impairs Public Trust Rights Is Subject to Judicial Review*

GBI and the State argue that since legislative action preempts the common law, it follows that the SMA and its corresponding Savings Clause should preempt Washington's common law public trust doctrine and preclude judicial review as well. We disagree. While GBI and the State correctly identify the doctrine's common law origin, they overlook the doctrine's constitutional footing.

As we have explained, the public trust doctrine is "partially encapsulated" in article 17 of our state constitution. *Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 232, 858 P.2d 232 (1993). Because of the doctrine's constitutional underpinning, any legislation that impairs the public trust remains subject to judicial review. This includes the SMA. "Holding otherwise [would] elevate[ ] an exercise of the legislative power above the constitution, which is anathema to our system of law." *Freedom Found. v. Gregoire*, 178 Wn.2d 686, 706, 310 P.3d 1252 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L. Ed. 60 (1803)). While we have at times described the SMA as embodying the common law public trust rights, *e.g.*, *Portage Bay–Roanoke Park Cmty. Council v. Shorelines Hr'gs Bd.*, 92 Wn.2d 1, 4, 593 P.2d 151 (1979), we have always embraced our constitutional responsibility to review challenged legislation, even legislation encompassed by the SMA, to determine whether that legislation comports with the State's public trust obligations. *Caminiti*, 107 Wn.2d at 670. We decline to abdicate that responsibility now.

The fact that the State never acquired title ownership to the Three Fingers property under article 17 does not mean the public trust doctrine has no constitutional force as to this property. As previously mentioned, article 17 recognized two distinct interests: the State's responsibility to protect

Washington's public trust interests and the State's title ownership in specific lands. *See id.* at 666-67. Therefore, any legislative act arguably in dereliction of the State's constitutional responsibility to protect the public trust interest is subject to judicial review regardless of article 17 title ownership.

### b. *The Party Challenging a Legislative Act Violates the Public Trust Doctrine Bears the Burden of Proving that Violation*

The party challenging the constitutionality of a legislative act, whether enacted by the legislature itself or the people through their initiative power, generally bears the burden of proving the act's invalidity. *Lee v. State*, 185 Wn.2d 608, 619, 374 P.3d 157 (2016). Even though public trust claims are only "quasi-constitutional," Ralph W. Johnson et al., *The Public Trust Doctrine and Coastal Zone Management in Washington State*, 67 WASH. L. REV. 521, 527 (1992)), our courts have generally treated public trust claims as constitutional challenges in presuming the constitutionality of the challenged legislation and placing the burden on the challenging party to prove otherwise. *E.g., Chelan Basin*, 194 Wn. App. at 494; *Samson v. City of Bainbridge Island*, 149 Wn. App. 33, 58, 202 P.3d 334 (2009); *Citizens for Responsible Wildlife Mgmt. v. State*, 124 Wn. App. 566, 570, 103 P.3d 203 (2004); *Wash. State Geoduck Harvest Ass'n v. Dep't of Nat. Res.*, 124 Wn. App. 441, 447, 101 P.3d 891 (2004).

The Conservancy disagrees with this approach, arguing it is inconsistent with our duty to review legislation that impairs public trust rights with a heightened degree of scrutiny. The Conservancy misconstrues that duty. Heightened scrutiny does not mean the party bearing the burden of proof should be different in the context of public trust challenges than constitutional challenges. As we explained in *Weden v. San Juan County*, we "review legislation under the public trust doctrine with a heightened degree of judicial scrutiny, 'as if [we] were measuring that legislation against constitutional protections.'" 135 Wn.2d 678, 698, 958 P.2d 273 (1998) (quoting Johnson et al., *supra*, at 526-27). Thus, just like with other constitutional challenges, the party claiming a legislative act violates the public trust doctrine bears the burden of proving that violation. *See id.* at 693 (placing the burden on the party challenging a governmental action to prove it violates the public trust doctrine).

Having addressed the parties' threshold questions regarding judicial review and allocation of proof, we now address their substantive arguments relating to the proper application of *Caminiti*'s two-part test.

    c.    *The State Abdicated Its Right of Control over the Jus Publicum When It Enacted the Savings Clause*

The first part of the *Caminiti* test asks "whether the state, by the questioned legislation, has given up its right of control over the jus

publicum." 107 Wn.2d at 670. The parties disagree whether the State abdicated control over the jus publicum when it consented under the Savings Clause to the permanent impairment of navigable waters by thousands of pre-*Wilbour* improvements. GBI and the State argue the enactment of the Savings Clause was an exercise of control rather than an abdication of it. While the line between the exercise and abdication of control may be difficult at times to discern, it is clear in this case.

The *Caminiti* test derives from the Supreme Court's opinion in *Illinois Central*. *Caminiti*, 107 Wn.2d at 670. At issue in *Illinois Central* was whether Illinois could grant to a private railroad company an irrevocable interest to fill or otherwise develop more than 1,000 acres of submerged lands comprising a substantial portion of Lake Michigan and the entire shoreline along the city of Chicago to support the railroad's private commercial enterprise. 146 U.S. at 454. The Supreme Court held the State could not. *Id.* at 452-55. The Court explained that while the State must generally protect its public trust resources, a state may abdicate control over some public trust properties without violating its public trust obligations if in doing so it promotes trust interests or does not substantially impair the public trust interest in the lands and waters remaining. *See id.* at 452. Applying that rule, the Court found Illinois had abdicated control when it

granted to a private company the authority to fill and develop more than 1,000 acres of submerged public trust lands. *Id.* at 452-54.

Here, the legislature consented to the impairment of significantly more property. Rather than a thousand acres, the Savings Clause impairs thousands of acres. *See* Rauscher, *supra*, at 531; *Port of Seattle*, 255 U.S. at 59; Johnson & Cooney, *supra*, at 289. Such authorization clearly constitutes an abdication of control comparable to the land grant in *Illinois Central*. Whether the abdication of control comports with the State's public trust obligations depends on part two of the *Caminiti* test.

d. *The Interests Promoted and Impaired by the Savings Clause Should Be Analyzed on a Statewide Basis*

The second part of the *Caminiti* test asks whether the challenged legislation "has promoted the interests of the public in the jus publicum" or "has not substantially impaired it." 107 Wn.2d at 670. If the Savings Clause satisfies either question, then it also satisfies judicial scrutiny under the public trust doctrine. *See id.* The parties debate whether the public trust interests promoted or impaired by the Savings Clause should be analyzed on

a statewide basis or as it relates to the Three Fingers fill on Lake Chelan. We hold, in this case, that the interests should be evaluated statewide.[6]

As discussed earlier, the legislature enacted the Savings Clause in response to our decision in *Wilbour*. The *Wilbour* decision had a significant effect on land titles throughout Washington not because it ushered in a new rule (the public trust doctrine had already been recognized), but because it awoke the doctrine from a decades-long slumber. *See Caminiti*, 107 Wn.2d at 670 ("Although not always clearly labeled or articulated as such . . . the doctrine has always existed in the State of Washington." (citing Johnson & Cooney, *supra*, at 285-87)). Following the doctrine's awakening, the legislature grappled with the possibility that the long-settled property expectations of Washington residents and businesses who had relied on legislative encouragement in building homes and investing significant resources in the improvement of Washington's shorelands and tidelands could be upended by public trust claims. *Sturtevant*, 76 Wash. at 171; 1 SENATE JOURNAL at 1411 (explaining "most of industry in the state that is on the water . . . is there illegally and subject to mandatory injunction to being removed by anyone that wants to bring the lawsuit"). Indeed, Washington's

---

[6] We reserve ruling on whether the same state- or jurisdiction-wide analysis should apply in cases challenging different state statutes or local ordinances since that question is not presented in this case.

then governor, Governor Evans, was so concerned about color of title in these properties that he placed a statewide moratorium on all tideland fill projects, which caused Washington's economy to stagnate. *See Orion*, 109 Wn.2d at 627. The legislature quickly responded with a single piece of legislation, the Savings Clause, that cleared title to all properties placed in legal limbo by *Wilbour* and allowed industry to flourish once again. *See* 1 SENATE JOURNAL at 1411.

Other jurisdictions faced with similar problems regarding historic improvements also acted swiftly through a single decisive action. Maine responded to the issue of historic fills by enacting legislation that granted all fills a 30-year easement to protect them temporarily from public trust claims. *Op. of Justices*, 437 A.2d 597, 599 (Me. 1981). In 1981, Maine sought a permanent solution and enacted a single bill to release all filled lands from any public trust servitude. *See id.* The California Supreme Court took a similar approach as the Maine legislature and extinguished the public trust interest over all historical fills in a single opinion. *Berkeley*, 26 Cal. 3d at 534-35.

Piecemeal scrutiny of such legislative actions would undermine the very purpose of these actions, which was to provide security to settled property expectations and protect the state's economy from languishing in

protracted litigation while waiting for titles to clear in thousands of cases.

For the foregoing reasons, the question of whether the Savings Clause

sufficiently promotes or does not substantially impair public trust interests

should be evaluated on a statewide basis. Because that analysis is factually

dependent, we remand to the trial court to determine in the first instance

whether the Savings Clause comports with the public trust doctrine.[7]

III.    The Conservancy Has Standing To Raise Its Public Nuisance
        Claim Based on a Public Trust Violation

---

[7] Although the Conservancy likens the public right to navigation to "'inalienable'" and "fundamental" constitutional rights, it did not argue that "heightened scrutiny" under the public trust doctrine is akin to strict scrutiny, thereby requiring state action to have a compelling state interest that is narrowly tailored to pass judicial muster. Supp'l Br. of Pet'r Conservancy at 10 (quoting Johnson et al., *supra*, at 539-40). In contrast, some jurists have advocated for a balancing test that considers the importance of the public interest being promoted in comparison to the impairment on the public trust rights. As Professor Johnson highlights, the priorities given to competing water needs for recreation, commerce, hydroelectric power, and agricultural irrigation vary among Washington's water-rich western regions and its arid eastern regions. Ralph W. Johnson, *Riparian and Public Rights to Lakes and Streams*, 35 WASH. L. REV. & ST. B. J. 580, 583-86 (1960). This suggests that under Professor Johnson's view, a significant impairment of the public right to use waters in place for recreational use might be acceptable for irrigation in eastern Washington, where irrigation is important, though the same impairment for the same reason might not be acceptable in western Washington, where tourism and recreation are vital. Professor Sax, who is often credited as the catalyst for the public trust's resurgence in the 1970s, seems to agree that a balancing test is needed, explaining that "[h]owever strongly one might feel about the present imbalance in resource allocation, it hardly seems sensible to ask for a freezing of any future specific configuration of policy judgments, for that result would seriously hamper the government's attempts to cope with the problems caused by changes in the needs and desires of the citizenry." Joseph L. Sax, *The Public Trust Doctrine in Nat'l Resource Law: Effective Judicial Intervention*, 68 MICH. L. REV. 471, 482 (1970). We make no determination on this matter at this time.

Finally, we address GBI's challenge to the Conservancy's standing to raise a public trust claim. GBI classifies this action as a public nuisance action and argues the Conservancy has failed to allege the Three Fingers fill is "specially injurious" to its members as is statutorily required under RCW 7.48.210.[8] The Conservancy denies it is raising a public nuisance claim. Instead, the Conservancy describes this action as a public trust action distinct from a public nuisance action. Both parties are partially correct in that this is a public nuisance action based on an alleged breach of the public trust doctrine.

There are many types of public nuisance actions, including actions to remove an animal carcass or an impediment on a river or highway and actions to abate pollution or the manufacture of dangerous chemicals near businesses. RCW 7.48.140. An action seeking the removal of an impediment on a waterway because it interferes with the public right to use that waterway is simply a specific type of public nuisance action. RCW 7.48.140(3). "Where the state has not approved impairment of state sovereign resources, private encroachment upon public use of the resources is treated as a public nuisance." 2 WATERS AND WATER RIGHTS, *supra* § 30.02(c), at 30-35. GBI is therefore correct that a plaintiff must be

---

[8] RCW 7.48.210 provides, "A private person may maintain a civil action for a public nuisance, if it is specially injurious to himself or herself but not otherwise."

"specially injur[ed]" in order to have standing to raise a public trust claim, but that requirement is not a particularly high bar.

Although RCW 7.48.210 requires the plaintiff be "specially injur[ed]," it does not indicate the injury needed to satisfy that requirement is more demanding or exacting than the injury needed for noneconomic standing generally. For an organization to have standing to raise noneconomic injuries, it must allege an "'injury in fact.'" *Save a Valuable Env't (SAVE) v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978) (quoting *United States v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 412 U.S. 669, 722, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973) (White, J., dissenting in part)). That means the organization "must show that it or one of its members will be specifically and perceptibly harmed by the action." *Id.* (citing *S.C.R.A.P.*, 412 U.S. 669). An interest that is only speculative or indirect is not enough. *Id.* at 867 (citing *Warth v. Seldin*, 422 U.S. 490, 514, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). Thus, in the absence of a statutory definition, we will treat "specially injurious" harms needed for public nuisance claims the same as "specific and perceptible" "injuries in fact" needed for noneconomic claims.

Injury to the aesthetic appeal and environment of an area is sufficient to support standing if the plaintiff establishes that he or she uses that area for

recreational purposes. *Sierra Club v. Morton*, 405 U.S. 727, 734-35, 92 S.

Ct. 1361, 31 L. Ed. 2d 636 (1972). The Conservancy satisfies that showing.

Its members claim that they are recreational users of Lake Chelan and that

the Three Fingers fill obstructs their desire and right to use navigable waters

over the property during the lake's high-water season. According to the

Conservancy's complaint:

> Chelan Basin Conservancy's members include James and Kitty
> Green, who own property and live in close proximity to the eastern
> side of the [Three Fingers] fill. The Greens are adversely affected
> by the existence of the fill which impairs their rights of public
> access, navigation, fishing, recreation, and view. Tammy Hauge is
> another member whose protected rights and interests similarly are
> threatened. Ms. Hauge lives in Lakeside, a short distance from the
> [Three Fingers] fill. She uses existing public access points to Lake
> Chelan but is denied the opportunity for additional and better access
> by the [Three Fingers] fill, and by the owners' exclusion of the
> public including Ms. Hauge from land over which there is a
> perpetual public right of access. Another member is Bill Schultz,
> whose fishing activities are restricted by the [Three Fingers] fill.
> Members John and Trisha Page kayak in Lake Chelan[,] including
> the area of the [Three Fingers] fill and similarly are affected
> adversely by the [Three Fingers] fill with respect to their rights of
> navigation and recreation.

Clerk's Papers at 4; *see also id.* at 374-76 (Decl. of Tammy Hauge)

(explaining how she could access the lake more easily if the fill was not

there), 379-81 (Decl. of William Schuldt) (declaring the same and adding

that he fishes in the lake too), 384-86 (Decl. of John Page Jr.) (explaining

how the fill has made kayaking dangerous for him). We hold the harms

alleged by the Conservancy's members are sufficiently distinct from the

general public to satisfy the standing requirements of RCW 7.48.210. The fact that the Conservancy's members have never been able to use the lake waters over GBI's property despite their desire to do so further shows their injury is real, not just speculative.

Contrary to GBI's arguments, neither *Lampa v. Graham* nor *Kemp v. Putnam* support its claim that the Conservancy lacks standing. *Lampa v. Graham*, 179 Wash. 184, 36 P.2d 543 (1934); *Kemp v. Putnam*, 47 Wn.2d 530, 288 P.2d 837 (1955). In *Lampa*, we held a fisherman would have standing to challenge the construction of a wing dam on a river channel if the dam harmed his fishing activities along that channel, but later opined that he would not have standing if his sole claim was an interference with his right to navigate along the channel since that injury would be the same as the injury sustained by the public generally. 179 Wash. at 186. We, however, later clarified the *Lampa* decision was fact-specific. *Kemp*, 47 Wn.2d at 535-36, *overruled on other grounds by SAVE*, 89 Wn.2d at 867 n.1. After *Lampa*, we held in *Kemp* that a person who regularly engages in recreational fishing in a stream would have standing to challenge the unlawful obstruction of that stream. *Id.* at 536.

CONCLUSION

The Conservancy seeks the abatement of fill material GBI added to its

property to elevate it above the waters of Lake Chelan because the increased

property elevation obstructs the public right to use navigable waters in place

over that property. We hold the Conservancy has standing to bring this

claim and conclude the legislature expressly consented to the fill's

impairment of navigable waters under the Savings Clause, RCW 90.58.270.

We reserve ruling on whether the Savings Clause violates the public trust

doctrine since the trial court never reached *Caminiti*'s factual analysis. We

therefore reverse and remand to the trial court to decide that issue.[9]

---

[9] We decline to address GBI's defense of laches, which it raised for the first time in its briefs before this court. Supp'l Br. for Resp't GBI Holding Co. at 12 n.13; Answer to Amicus Curiae Br. of Center for Envt'l Law & Policy at 19 n.9; *see Cummins v. Lewis County*, 156 Wn.2d 844, 851, 133 P.3d 458 (2006) ("It is a well-established maxim that this court will generally not address arguments raised for the first time in a supplemental brief and not made originally by the petitioner or respondent within the petition for review or the response to the petition." (citing *Douglas v. Freeman*, 117 Wn.2d 242, 258, 814 P.2d 1160 (1991))).

González, J.

WE CONCUR:

Fairhurst, C.J.

Johnson, J.

Madsen, J.

Owens, J.

Stephens, J.

Wiggins, J.

Gordon McCloud, J.

Yu, J.