IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CHELAN BASIN CONSERVANCY, | ) | No. 33196-2-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 33239-0-III) |
| | ) | |
| v. | ) | |
| | ) | |
| GBI HOLDING CO. and | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Appellants and | ) | |
| Cross Respondents, | ) | |
| | ) | |
| CITY OF CHELAN, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent and | ) | |
| Cross Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHELAN COUNTY PUBLIC UTILITY | ) | |
| DISTRICT, | ) | |
| | ) | |
| Additional Named | ) | |
| Party. | ) | |

PENNELL, J. — Since the early 1960s, GBI Holding Co. and its predecessors

(collectively GBI) have maintained a private landfill commonly known as the "Three

Fingers" on the shore of Lake Chelan. For members of the Chelan Basin Conservancy

(CBC), the Three Fingers fill is a blot on the otherwise pristine shores of the lake and unreasonably interferes with access to the beach and navigable waters. After GBI initiated plans to develop the Three Fingers fill in 2010, CBC took legal action. Relying on the little-known "public trust doctrine," CBC sought not simply to thwart GBI's development plans, but to force it to abate its long-held fill.

CBC's legal challenge to the Three Fingers fill requires analyzing the relationship between the public trust doctrine and the Shoreline Management Act of 1971 (SMA), ch. 90.58 RCW. The SMA was approved by voter referendum in 1972 and designed to handle public trust disputes through regulation. It also included a savings clause that grandfathered in preexisting landfills against claims for violation of the public rights of navigation. We are confronted with whether the SMA's savings clause applies to the Three Fingers fill and, if so, whether this portion of the SMA itself violates the public trust doctrine. We hold that (1) the SMA's savings clause does plainly protect long-held fills such as the Three Fingers, and (2) CBC has not shown the SMA to be invalid. We therefore reverse the superior court's orders requiring GBI to abate its fill.

## FACTS

The Three Fingers fill is an area of land, approximately six to eight acres in size, owned by GBI. The fill is located on the southeastern shoreline of Lake Chelan,

immediately west of the fill addressed in the Washington Supreme Court case of *Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232 (1969). As more fully described in *Wilbour*, the completion of Lake Chelan Dam in 1927 artificially raised the level of the lake from 1,079 feet to 1,100 feet above sea level during peak summer months. 77 Wn.2d at 307, 309. The Three Fingers fill is on lands that were dry when the lake was at its lowest level but covered with water during the spring and summer when the lake was at its peak level. In 1961, GBI acquired the property as part of a project to widen State Route 97A. From 1961 to 1962, GBI filled the property with materials excavated during roadway construction, raising the elevation of the land from 1,090 feet to 1,102 feet above sea level and extending it 250 to 300 feet into the lake. After GBI raised the property, it remained above lake level year round.

The Three Fingers fill does not hold any structures. It has been used in the past for growing corn, parking, and as a staging area for work on the Holden Mine hazardous waste cleanup. In 2010, GBI filed an application with the City of Chelan (City) to improve the Three Fingers fill as a planned development district. CBC, a local group interested in protecting the "use and enjoyment of the navigable waters of Lake Chelan," and others objected to the development. Clerk's Papers at 4. GBI thereafter withdrew its application for planned development and then filed a new application to subdivide the

3

land into six parcels. CBC and others again objected and requested removal of the Three

Fingers fill. In 2011, the City approved a short plat to subdivide the property subject to

conditions, which included requiring (1) a public park be developed from two of the lots,

and (2) public access to the lake for recreation. Both CBC and GBI appealed the short

plat decision to the City's hearing examiner. In a preliminary ruling, the hearing

examiner concluded the City lacked authority to order removal of the Three Fingers fill.

CBC thereafter withdrew its administrative appeal and in late 2011 filed an action in

superior court for removal of the Three Fingers fill.

CBC's complaint alleged the Three Fingers fill (1) constitutes a trespass against

the public right of access to Lake Chelan,[1] (2) violates the public rights of navigation as

described in *Wilbour*, and (3) violates rights to use and enjoy the waters of Lake Chelan

as protected by the public trust doctrine. The complaint named GBI as the defendant and

the City,[2] State,[3] and Chelan County Public Utility District (PUD)[4] as additional parties.

---

[1] CBC's trespass claim has not been pursued on appeal and, therefore, is not addressed in this decision.

[2] The City is the local municipal corporation that chose to participate in the case by counterclaiming and cross claiming for review of the City's assessment of public trust rights in its administrative decision.

[3] Though CBC made no specific claim against the State, the State has participated because the case involves questions about the State's authority under the public trust doctrine.

4

No. 33196-2-III (consol. w/ No. 33239-0-III)
*Chelan Basin Conservancy v. GBI Holding Co.*

After several years of litigation, the superior court resolved CBC's complaint on

summary judgment. The court held the Three Fingers fill violated the public trust

doctrine, subsequently ordering GBI to abate the fill. We are now presented with the case

on appeal.

ANALYSIS

*Standard of Review*

This court reviews summary judgment orders de novo, "engaging in the same

inquiry as the trial court." *Weden v. San Juan County*, 135 Wn.2d 678, 689, 958 P.2d 273

(1998). "Summary judgment is appropriate only if the pleadings, affidavits, depositions,

and admissions on file demonstrate the absence of any genuine issues of material fact and

that the moving party is entitled to judgment as a matter of law." *Citizens for Responsible

Wildlife Mgmt. v. State*, 124 Wn. App. 566, 569, 103 P.3d 203 (2004); *see also* CR 56(c).

At issue here are questions of both statutory construction and constitutional limits

on state authority. "Issues of statutory construction and constitutionality are questions of

law" also subject to de novo review. *State v. Evans*, 177 Wn.2d 186, 191, 298 P.3d 724

(2013). Regularly enacted statutes are presumed constitutional, unless the provision

---

[4] CBC named the PUD because it holds flowage rights in Lake Chelan, but the
PUD announced early on that it was not participating in the case.

5

"involves a fundamental right or a suspect class, in which case the presumption is reversed." *Weden*, 135 Wn.2d at 690. The statute's challenger has the heavy burden of overcoming the presumption of constitutionality. *Island County v. State*, 135 Wn.2d 141, 146, 955 P.2d 377 (1998).

*The Public Trust Doctrine*

The public trust doctrine has both common law and constitutional roots. With statehood, Washington asserted ownership to "the beds and shores of all navigable waters in the state . . . ." WASH. CONST., art. XVII, §1. Along with this right of ownership came a duty of public trust. Although not always clearly labeled as such, Washington courts have always recognized this duty under the "public trust doctrine." *Caminiti v. Boyle*, 107 Wn.2d 662, 669-70, 732 P.2d 989 (1987). According to the doctrine, the State holds an interest in navigable waters akin to a permanent easement: while the State has the power to convey the title to lands covered by navigable waters, it can never alienate the public's right to use navigable waters. *City of New Whatcom v. Fairhaven Land Co.*, 24 Wash. 493, 499, 504, 64 P. 735 (1901). Instead, the State retains inalienable power over navigable waters "in trust for the whole people. . . ." *State v. Sturtevant*, 76 Wash. 158, 165, 135 P. 1035 (1913). Under the public trust doctrine, the State's private interest, which may be sold, is referred to as the "jus privatum." *Caminiti*, 107 Wn.2d at 668. The

public interest that cannot be divested is called the "jus publicum." *Id.*

Despite the public trust doctrine's ever presence, Washington's early history was marked by a preference for development over conservation. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 232 (2d ed. 2013). This trend shifted in 1969 with the *Wilbour v. Gallagher* decision. As noted, *Wilbour* involved litigation over a landfill bordering the Three Fingers. The Wilbours lived next to the Gallaghers and filed suit shortly after construction of the Gallagher fill. The Wilbours argued the Gallagher fill must be abated because it interfered with their rights of navigation. The Supreme Court agreed. The court reasoned the public has an inalienable right to access the waters of Lake Chelan, regardless of seasonal fluctuations in lake levels. *Wilbour*, 77 Wn.2d at 316. The Gallaghers were thus prohibited from obstructing access through creating a fill. *Id.* As explained by the court, "the public has the right to go where the navigable waters go, even though the navigable waters lie over privately owned lands." *Id.* at 315-16.

*Wilbour* marked "the modern genesis of the public trust doctrine" in Washington. Ralph W. Johnson et al., *The Public Trust Doctrine and Coastal Zone Management in Washington State*, 67 WASH. L. REV. 521, 537 (1992). The decision also generated quite a stir, with both developers and conservationists confused about the extent of their legal

7

rights and obligations. Geoffrey Crooks, *The Washington Shoreline Management Act of 1971*, 49 WASH. L. REV. 423, 425 (1974). Shortly after *Wilbour*, Governor Evans imposed a moratorium on all tideland fill projects until 1971 when the SMA was enacted. *Orion Corp. v. State*, 109 Wn.2d 621, 627, 747 P.2d 1062 (1987).

The SMA created a regime to manage the competing interests of development and conservation. Because the act regulates shorelines in a manner that promotes and enhances the public's interest in navigation, compliance with the SMA forecloses any claim that a land use action violates the public trust doctrine. *Caminiti*, 107 Wn.2d at 670. In this manner, the SMA largely addressed prospective claims under the public trust doctrine. But the SMA also did more. To address development that had taken place prior to the SMA, the legislature adopted the following savings clause:

> Nothing in this section shall constitute authority for requiring or ordering the removal of any structures, improvements, docks, fills, or developments placed in navigable waters prior to December 4, 1969, and the consent and authorization of the state of Washington to the impairment of public rights of navigation, and corollary rights incidental thereto, caused by the retention and maintenance of said structures, improvements, docks, fills or developments are hereby granted: PROVIDED, That the consent herein given shall not relate to any structures, improvements, docks, fills, or developments placed in tidelands, shorelands, or beds underlying said waters which are in trespass or in violation of state statutes.

RCW 90.58.270(1). Notably, the controlling date in this clause is the same as the *Wilbour v. Gallagher* decision.

8

After the SMA's enactment, property developments and landfills predating *Wilbour* were left unchallenged. CBC's legal suit has altered this state of repose. Now, over 40 years later, we are confronted with discerning the meaning and validity of the SMA's savings clause in the context of a public trust challenge.

## CBC's Claim for Relief

### Standing

As a preliminary matter, GBI claims we need not address the merits of CBC's suit because CBC lacks standing to challenge the validity of the Three Fingers fill. GBI's argument is rooted in the law regarding public nuisances. To bring a public nuisance claim, a plaintiff must show special injury. RCW 7.48.210. GBI argues CBC, whose members have general interests in lake access and recreation, is not specially injured by the Three Fingers fill.

GBI's standing analysis fails because this is not a public nuisance case. CBC has explicitly disavowed making a public nuisance claim. Instead, the current suit involves a public trust claim. The issue of standing, therefore, turns on whether either CBC or its members can claim the type of injury required in the public trust context.

Because cases interpreting Washington's public trust doctrine are limited, the requirements for establishing standing are not well defined. In *Wilbour v. Gallagher*, the

plaintiffs' property bordered the Gallagher fill, yet this proximity did not form the basis for the Wilbours' ultimate relief. The Wilbours had originally sued based on impairment of their view as well as "inability to use the water over the filled land for navigation, fishing, swimming, boating and general recreational uses . . . ." *Wilbour*, 77 Wn.2d at 312. The Supreme Court denied relief based on impairment to the Wilbours' view but found in their favor based on navigational rights. *Id.* at 313. This was not a right specific to the Wilbours, but one shared by the public. While the Wilbours' interest in their view may have been greater than the public's, their interest in utilizing navigational waters was not. It would thus appear the action brought by the Wilbours could have been brought by others with an interest in accessing Lake Chelan's waters.

Affidavits from CBC's members demonstrate they have various recreational interests in Lake Chelan similar to those outlined in *Wilbour*. The interests claimed by CBC's members are precisely those the public trust doctrine is meant to protect. *Weden*, 135 Wn.2d at 698. CBC has thus sufficiently established standing.

*Applicability of the SMA's savings clause*

Having established standing, the next hurdle in CBC's quest for abatement is the SMA's savings clause. RCW 90.58.270(1) authorizes impairment of public navigational rights caused by fills preexisting the 1969 *Wilbour* decision. This authorization would

10

appear on its face to prevent CBC's claim. However, there is a limiting provision. The

provision permits suits against pre-*Wilbour* fills if they "are in trespass or in violation of

state statutes." RCW 90.58.270(1). CBC seizes on this limiting provision. According to

CBC, if it can establish the Three Fingers fill violates some sort of state statute (such as

the statute prohibiting public nuisances) then the restriction on claims regarding

impairments to the public rights of navigation is lifted.

Resolving CBC's claim under RCW 90.58.270(1) requires us to engage in

statutory interpretation. "The purpose of statutory interpretation is to 'determine and give

effect to the intent of the legislature.'" *Evans*, 177 Wn.2d at 192 (quoting *State v.

Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012)). "If the plain language is subject to

only one interpretation, our inquiry ends because plain language does not require

construction." *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297

(2009). But where there is ambiguity, the court will engage in statutory construction and

may "look to legislative history for assistance in discerning legislative intent." *Evans*,

177 Wn.2d at 193.

The debate during the superior court proceedings reveals an ambiguity in the

SMA's savings clause. Does the savings clause protect all pre-1969 fills from public

navigational claims? Or are preexisting fills vulnerable to navigational claims if a

11

plaintiff can first establish a statutory violation or trespass claim? The plain language of the statute favors the former approach. For example, RCW 90.58.270(4) states the protection against public navigation claims extended to pre-1969 fills that were involved in litigation at the time of the SMA's enactment. Had the legislature intended navigational claims to go forward as long as a plaintiff alleged an additional cause of action, this provision would not have been written in such broad terms. Nevertheless, given the different opinions of reasonable minds during the superior court proceedings, we turn to legislative history.

What little legislative history exists regarding the SMA's savings clause indicates a clear intent to eliminate *Wilbour*-type suits for preexisting fills. The following colloquy in the Senate Journal is telling:

> Senator Whetzel: "Another question. Over on page 20 in the amendment to line 6 that changes the date to December 4, 1969, this I assume relates to the Wilbour vs. Gallagher case and ..."
> Senator Gissberg: "Yes."
> Senator Whetzel: "I think makes legal any fills that took place prior to December 4, 1969."
> Senator Gissberg: "Yes."
>  . . . .
> Senator Whetzel: "Are we changing the result in the Wilbour case or any other case by, I guess my question includes both the amendment to the date and the ..."
> Senator Gissberg: "Yes, I think in the entire section in subsection (3), you are, the state of Washington is giving its consent to the impairment of public rights of navigation as to those structures, improvements, docks, fills

or developments which were placed in navigable waters prior to December 4, 1969. And it is a savings clause for those structures that were placed there prior to Wilbour vs. Gallagher. If it is not there, then every dock, most of industry in the state that is on the water, of course, is there illegally and subject to mandatory injunction to being removed by anyone that wants to bring the lawsuit. Consequently, that is why the savings clause is there, and the state is giving, or purports to give its consent to the impairment of the navigable rights of the public generally which are impeded by the construction of those docks and facilities that are in the navigable waters."

1 SENATE JOURNAL, 42d Leg., 1st Ex. Sess., at 1411 (Wash. 1971).

CBC's construction of the savings clause would undermine this intent. At the time the SMA was enacted in 1971, Senator Gissberg recognized most if not all of the State's numerous landfills violated the terms of *Wilbour*. The goal of the savings clause was to avoid the automatic removal of preexisting fills that was threatening to take place post-*Wilbour*. If CBC's analysis was correct, then vast numbers of preexisting fills would again be put at risk. Any statutory violation, even ones having nothing to do with navigation or conservation, could justify a *Wilbour* public trust claim. This outcome cannot be reconciled with the SMA's unambiguous legislative history.

The SMA's savings clause reads naturally when considered in light of the intent expressed in the Senate Journal. While RCW 90.58.270(1) eliminates claims based on impairment of the public rights of navigation, preexisting fills are not wholly immune

13

from suit. Claims can still be made for trespass or violation of state statutes.[5] But a trespass or statutory claim cannot be utilized as an end run around the prohibition on public trust claims. Instead, a claim for trespass or a statutory violation must stand on its own, separate from any claim under the public trust doctrine.

During the superior court proceedings, the trial court addressed not only CBC's public trust claim, but also the argument that the Three Fingers fill constitutes a statutory public nuisance. Because CBC has disavowed a public nuisance claim, we technically need not address this issue. Nevertheless, because the matter has been fully briefed and may reoccur in the future, we will also analyze whether the SMA's savings clause can bar a navigational claim filed under Washington's nuisance statute.

Washington's nuisance laws have been codified in chapter 7.48 RCW. "A nuisance 'which affects equally the rights of an entire community or neighborhood' is a

---

[5] In addition, the savings clause applies only to the retention and maintenance of preexisting fills. A fill that is falling apart or was in disrepair at the time of the SMA's savings clause is not protected. *See, e.g.*, *Reed v. Dep't of Ecology*, No. 87-34, 1988 WL 161202, at *3 (Wash. Shorelines Hr'gs Bd. May 10, 1988). CBC argues the savings clause does not protect GBI because GBI is no longer maintaining its fill. Instead, GBI has proposed to develop the area. However, GBI's development plans are not currently before this court. Besides, the issue of whether proposed development violates public trust interests is properly addressed through the SMA's regulatory provisions. *Caminiti*, 107 Wn.2d at 670 ("the requirements of the 'public trust doctrine' are fully met by the legislatively drawn controls imposed by the [SMA].").

14

public nuisance." *Grundy v. Thurston County*, 155 Wn.2d 1, 6, 117 P.3d 1089 (2005) (quoting RCW 7.48.130). Public nuisances can include "obstruct[ing] or imped[ing], without legal authority, the passage of any river, harbor, or collection of water. . . ." RCW 7.48.140(3). In other words, public nuisance claims can extend to impairment of the public rights of navigation. While the public nuisance statute creates a broad cause of action that can undoubtedly apply to some landfills, the legislature has exerted significant control over nuisance suits. The law explicitly provides "[n]othing which is done or maintained under the express authority of a statute, can be deemed a nuisance." RCW 7.48.160.

The legislative control over public nuisance suits bars navigational claims in the current context. By consenting to the existence of pre-*Wilbour* fills against public navigational claims, the legislature invoked application of RCW 7.48.160, which forbids a cause of action based on public nuisance. Thus, the moment the SMA passed, the ability to file a public nuisance claim against a preexisting fill was extinguished.[6]

The fact that a once-authorized fill can later become a public nuisance, *see Grundy*, 155 Wn.2d at 7 n.5, does not create an opening for suit in the current context. In

---

[6] Legal claims pending at the time of passage were also eliminated. RCW 90.58.270(4).

15

order for this exception to apply, a fill must deviate in some way from its initial

authorization. For example, if a fill starts to degrade or expand beyond its original

intrusion into navigable waters, it may well become a public nuisance. But the record

here is devoid of any such facts. GBI's fill is thus protected from a public nuisance suit

by the combined forces of RCW 90.58.270 and RCW 7.48.160.

*The SMA's savings clause and the public trust doctrine*

Because the Three Fingers fill is protected from suit under either a public trust or

public nuisance theory by the SMA's savings clause, we are confronted with whether the

savings clause itself violates the public trust doctrine. This is a challenge distinct from

the kind of challenge raised in *Wilbour*. When a legislative challenge is made under the

public trust doctrine, the court "must inquire as to (1) whether the State, by the questioned

legislation, has given up its right of control over the jus publicum [i.e. the public's

inalienable rights of navigation] and (2) if so, whether by so doing the State (a) has

promoted the interests of the public in the jus publicum, or (b) has not substantially

impaired it." *Caminiti*, 107 Wn.2d at 670.

The Supreme Court engaged in this legislative analysis in *Caminiti*. The court

held that a Washington statute allowing residential property owners to maintain private

docks without charge passed all components of the test. *Id.* at 675. Other statutes

16

challenged under the public trust doctrine have met the same fate. *Weden*, 135 Wn.2d at 699; *Citizens*, 124 Wn. App. at 573-74. While these outcomes may seem frustrating to public trust advocates, they are consistent with the Supreme Court's observation in *Wilbour* that public trust issues are often best sorted out by the legislature through regulation. 77 Wn.2d at 316 n.13. *See also Harris v. Hylebos Indus., Inc.*, 81 Wn.2d 770, 787, 505 P.2d 457 (1973) ("[The *Wilbour* court] had in mind the right of appropriate governing bodies to authorize fills and commercial uses of lands situated on the shores of navigable bodies of water.").

A challenge to legislation under the public trust doctrine is akin to a constitutional challenge. *Citizens*, 124 Wn. App. at 570-71. Given this similarity, the burden of proving invalidity of the statute properly rests on the challenging party. *Id.* at 570. This means CBC. Both CBC and the City object to this allocation. They note the following Supreme Court passage: "[C]ourts review legislation under the public trust doctrine with a heightened degree of judicial scrutiny, 'as if they were measuring that legislation against constitutional protections.'" *Weden*, 135 Wn.2d at 698 (quoting Johnson, *supra*, at 526-27).

Allocating the burden of proof to CBC does not violate the principle recognized in *Weden*. If the burden of proving a statute's invalidity rests with the party asserting a

17

constitutional challenge, the same should be true here. Public trust claims are merely quasi-constitutional. The ability to assert a public trust claim should not be easier than in the constitutional context. We have previously allocated the burden of proof to the challenger in the public trust context. *Citizens*, 124 Wn. App. at 570. We see no reason to deviate from this precedent, particularly since the challengers have waited over 40 years to bring suit.

Reviewing the SMA's savings clause under the *Caminiti* test requires looking at the legislation as a whole, not a particular application. Indeed, *Caminiti* did not review the reasonableness of the legislation at issue by examining its application to a specific dock. Instead, the court examined the statute's statewide impact. *Caminiti*, 107 Wn.2d at 672. Because vast areas of water were unaffected, the court concluded the legislature had not substantially given up control over the public's navigational rights. *Id.* ("By enacting RCW 79.90.105, the [l]egislature has given up relatively little right of control over the jus publicum").

During the superior court proceedings, CBC's focus was on whether the Three Fingers fill met terms of the test outlined in *Caminiti*. This was mistaken. Whether or not the Three Fingers fill serves a legitimate public purpose is not particularly relevant to the legality of the SMA's savings clause. Because the Three Fingers fill is clearly

18

protected by the SMA's savings clause, CBC's public trust claims can only go forward if the savings clause, applied as a whole throughout the state, is invalid. No such showing has been made. Given the passage of time, it is unclear whether any such showing can ever be made. During oral argument, the State suggested the SMA's savings clause promoted the public trust in navigable waters because most pre-*Wilbour* fills were useful and afforded access to deep waters. We have no facts to verify this claim. Nor do we have facts to refute it. Because the burden of proof falls on CBC, the challenge to the savings clause must fail.

Based on the foregoing, the superior court's order granting summary judgment and the order for abatement are reversed. This matter is remanded to the superior court for proceedings consistent with this opinion.

Pennell, J.

WE CONCUR:

Korsmo, J.

Siddoway, J.

19