González, J.
*552 *254 ¶ 1 Petitioner Chelan Basin Conservancy (Conservancy) seeks the removal of six acres of fill material that respondent GBI Holding Company added to its property in 1961 to keep the formerly dry property permanently above the artificially raised seasonal water fluctuations of Lake Chelan. The Conservancy brings this action more than 50 years later pursuant to Washington's public trust doctrine, which protects the public right to use water in place along navigable waterways. At issue is whether the State consented to the fill's impairment of that right in 1971 and, if so, whether such consent violates the public trust doctrine.
¶ 2 The Court of Appeals held the "Three Fingers" fill was expressly protected by RCW 90.58.270 (the Savings Clause) from public trust challenges. We agree. As explained in this opinion,[1] the legislature expressly consented to the placement of pre-1969 fills, which includes the Three Fingers fill, when it enacted the Savings Clause and that consent does not violate the public trust doctrine. We therefore affirm.
*255 FACTS AND PROCEDURAL BACKGROUND
¶ 3 Our state constitution grants the State "ownership to the beds and shores of all navigable waters in the state." CONST. art. XVII, § 1 (article 17). We have interpreted this provision to mean the State possesses an alienable, fee-simple private property interest in those beds and shores subject to an overriding public servitude to use the waters in place for navigation and fishing, and other incidental activities. Caminiti v. Boyle, 107 Wash.2d 662, 668-69, 732 P.2d 989 (1987). The parties agree that Lake Chelan is a navigable body of water and that GBI's property along the lake is subject to the public trust servitude.
¶ 4 In its natural state, GBI's property stood above the lake's peak water levels and was continuously dry throughout the year. See Wilbour v. Gallagher, 77 Wash.2d 306, 307, 462 P.2d 232 (1969). In 1927, GBI's predecessor in interest granted a flowage easement over the property to a power company to install a dam that would raise the lake's waters. Id. at 307-08, 462 P.2d 232 (discussing covenants related to the construction of the dam). After the dam was installed, GBI's once dry land became seasonally submerged by the lake's elevated waters.
¶ 5 In 1961, GBI added fill to its property to elevate it once more above the lake's seasonal fluctuations. The fill is locally referred to as "the Three Fingers" because it resembles, in aerial photographs, three rectangular protrusions into the lake.
¶ 6 Eight years after GBI filled its property, we held in Wilbour, a case involving a neighboring landfill abutting Lake Chelan, that the neighbor's fill violated the public trust doctrine and ordered the fill be abated. Id. at 315-16, 462 P.2d 232. Although we acknowledged the existence of other similarly situated fills along the lake, our Wilbour decision did not order their abatement. Id. at 316, 462 P.2d 232 n.13. Despite its limited disposition, Wilbour was publicly hailed as a watershed *256 case that placed title to thousands of properties along Washington's shores in question. See 1 SENATE JOURNAL , 42d Leg., 1st Ex. Sess., at 1411 (Wash. 1971). That is because much of Washington's shores and tidelands were improved during our early years of statehood, when private settlement and development were widely encouraged with little consideration given to the effect these developments would have on public trust rights. See State v. Sturtevant, 76 Wash. 158, 171, 135 P. 1035 (1913). By 1969, thousands of acres of Washington's tidelands and shorelands had been reclaimed and developed with significant improvements, including the creation of Harbor Island and much of downtown Seattle. Edward A. Rauscher, The Lake Chelan Case-Another View, 45 WASH. L. REV. 523, 531 (1970); *553 Port of Seattle v. Or. & Wash. R. R. Co., 255 U.S. 56, 59, 41 S.Ct. 237, 65 L.Ed. 500 (1921) ; Ralph W. Johnson & Eileen M. Cooney, Harbor Lines and the Public Trust Doctrine in Washington Navigable Waters, 54 WASH. L. REV. 275, 289 n.64 (1979) (noting that the state had sold approximately 60 percent of its tidelands to private parties between 1889 and 1971 (citing DEP'T OF ECOLOGY, WASH. STATE COASTAL ZONE MGMT. PROGRAM 73 (1976) ) ).
¶ 7 The legislature responded to the Wilbour decision by enacting the Savings Clause, RCW 90.58.270, that gave post hoc consent to pre- Wilbour improvements expressly to protect them from public trust challenges. See 1 SENATE JOURNAL at 1411. The Savings Clause was enacted as part of a much broader piece of legislation known as the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW, and directly responded to our directive to the legislature in Wilbour that it, as trustee of public trust resources, was responsible for determining how best to preserve and promote the State's public trust interests. See Wilbour, 77 Wash.2d at 316 n.13, 462 P.2d 232.
¶ 8 The legislature referred the SMA to the people the following year for ratification. State of Washington Voters Pamphlet, General Election 34-35, (Nov. 7, 1972) (App. to *257 Supp'l Br. of Resp't State of Wash.). The legislature presented the SMA to Washington voters along with an alternative measure, Initiative 43. Id. at 32-33. Although both the SMA and Initiative 43 established guidelines for the development of Washington's waterways and shorelines, one major difference between the two plans was how they treated pre- Wilbour fills. Id. at 108. The SMA provided legislative consent to pre- Wilbour fills, whereas Initiative 43 did not. Id. The people ratified the SMA and rejected Initiative 43 by a substantial margin. WASH. SEC'Y OF STATE , Initiative to the Leg. No. 43 (General Election Nov. 7, 1972) (285,721 voters preferred Initiative 43, while 611,748 voters preferred the SMA). Following ratification of the SMA, little legal attention was given to pre- Wilbour fills.[2]
¶ 9 The Three Fingers fill gained attention in 2010 when GBI submitted a permit application to the city of Chelan to develop the fill. GBI later withdrew its application, following public opposition to the proposed development. Eventually, GBI submitted a second application, this time to subdivide the property into six short plats with no immediate plans for their development. The city approved the short plat application conditioned on the reservation of a public park and several public access points thereon. GBI appealed the city's conditional land use decision, but the appeal has been stayed pending resolution of this action.
¶ 10 Turning to the underlying action, the Conservancy, a local environmental group, responded to GBI's permit applications by filing this action against GBI, which seeks the abatement and removal of the Three Fingers fill pursuant *258 to the public trust doctrine and Wilbour .[3] The Conservancy additionally named the city of Chelan, the State of Washington, and the owner of the dam, Chelan County Public Utility District, as interested parties in this action.
¶ 11 GBI moved for summary judgment, arguing, among other things, that the Conservancy lacked standing to bring the present action and that any public trust claim seeking the removal of the Three Fingers was barred by the SMA's Savings Clause, RCW 90.58.270. The Conservancy moved for summary judgment on the applicability of the Savings Clause and the public trust doctrine as well.
*554 ¶ 12 Regarding the justiciable question of standing, the trial court found the Conservancy had standing to raise its public trust claim. As for the Savings Clause and its interplay with the public trust doctrine, the trial court initially found the Savings Clause violated the public trust doctrine but later rescinded that decision, choosing instead to avoid the public trust question altogether by holding the Savings Clause did not apply to the Three Fingers fill. After finding the legislature never consented to the creation of the Three Fingers fill, the court ordered the fill be removed.
¶ 13 GBI appealed to the Court of Appeals, which reversed the trial court's order and remanded for further proceedings. Chelan Basin Conservancy v. GBI Holding Co., 194 Wash.App. 478, 495, 378 P.3d 222 (2016). The Court of Appeals agreed with the trial court that the Conservancy had standing to sue but departed from the trial court's analysis regarding the applicability of the Savings Clause. Id. at 487-95, 378 P.3d 222. The Court of Appeals held the Savings Clause applied to the Three Fingers fill and the statute's corresponding bar on public trust claims was enforceable against the Conservancy's public trust claims since the Conservancy failed to prove the statute violated the public trust doctrine. Id. at 488-95, 378 P.3d 222.
*259 ¶ 14 The Conservancy petitioned this court for review regarding the applicability of the Savings Clause to the Three Fingers fill and whether the Savings Clause violates the public trust doctrine. In its answer, GBI requested pursuant to RAP 13.4(d) that if we grant review, we should also address the issue of standing. We granted review without limitation. Chelan Basin Conservancy v. GBI Holding Co., 186 Wash.2d 1032, 385 P.3d 769 (2016). We therefore address three issues: (1) whether the Savings Clause, RCW 90.58.270, applies to the Three Fingers fill, (2) if so, whether the clause violates the public trust doctrine, and (3) whether the Conservancy has standing to bring this public trust action. We hold that while the Conservancy has standing to bring this public trust action, it nevertheless is barred by the Savings Clause from raising a public trust claim for the removal of the Three Fingers fill.
WASHINGTON'S PUBLIC TRUST DOCTRINE
¶ 15 The public trust doctrine is an ancient common law doctrine that recognizes the public right to use navigable waters in place for navigation and fishing, and other incidental activities. E.g., Caminiti, 107 Wash.2d at 668-69, 732 P.2d 989. The principle that the public has an overriding interest in navigable waterways and the lands underneath them has been dated by some jurists as far back as the Code of Justinian, which was developed in Rome during the 6th century. While there is some debate whether this attribution to Roman law holds water, it is generally accepted even among the most skeptical of critics that the public trust doctrine has a long history and was firmly ingrained in English and American common law by the 19th century. See, e.g., James L. Huffman, Speaking of Inconvenient Truths -A History of the Public Trust Doctrine, 18 DUKE ENVTL. L. & POL'Y F. 1, 12-19 (2007).
¶ 16 Although the public trust doctrine originates from a common source, " 'it has been long established that the individual [s]tates have the authority to define the limits *260 of the lands held in public trust and to recognize private rights in such lands as they see fit.' " State v. Longshore, 141 Wash.2d 414, 427-28, 5 P.3d 1256 (2000) (quoting Phillips Petrol. Co. v. Mississippi, 484 U.S. 469, 475, 108 S.Ct. 791, 98 L.Ed. 2d 877 (1988) ); Grays Harbor Boom Co. v. Lownsdale, 54 Wash. 83, 104, 104 P. 267 (1909) (per curiam) (" 'The whole question [regarding the scope of the public trust doctrine] is for the state to determine for itself.' " (quoting Shively v. Bowlby, 152 U.S. 1, 56, 14 S.Ct. 548, 38 L.Ed. 331 (1894) ) ); Sequim Bay Canning Co. v. Bugge, 49 Wash. 127, 132, 94 P. 922 (1908) (recognizing each state's prerogative to define and decide how to protect or dispose of its public trust property). We therefore "look solely to Washington law" when determining the scope and application of our public trust rights and obligations. Longshore, 141 Wash.2d at 428, 5 P.3d 1256. *555 ¶ 17 Even though Washington's public trust right to use navigable waters in place is sometimes described as a right that can be "neither destroy[ed] nor abridge[d]," New Whatcom v. Fairhaven Land Co., 24 Wash. 493, 499, 64 P. 735 (1901), this does not mean that the State must hold all the beds and shores of navigable waters inviolate. Davidson v. State, 116 Wash.2d 13, 16, 802 P.2d 1374 (1991) ; Caminiti, 107 Wash.2d at 668, 732 P.2d 989. Under article 17 of our state constitution, "the state of Washington has the power to dispose of, and invest persons with, ownership of tidelands and shorelands subject only to the paramount right of navigation and the fishery." Id. at 667, 732 P.2d 989. This is because the State owns article 17 lands in two distinct capacities. Longshore, 141 Wash.2d at 427, 5 P.3d 1256 ; Caminiti, 107 Wash.2d at 668-69, 732 P.2d 989 ; Orion Corp.v. State, 109 Wash.2d 621, 639, 747 P.2d 1062 (1987) ; Eisenbach v. Hatfield, 2 Wash. 236, 240-41, 26 P. 539 (1891).
¶ 18 First, as title owner, "the [S]tate holds full proprietary rights in tidelands and shorelands and has fee simple title to such lands" so that it "may convey title to [those lands] in any manner and for any purpose not forbidden by *261 the state or federal constitutions and its grantees take title as absolutely as if the transaction were between private individuals." Caminiti, 107 Wash.2d at 668, 732 P.2d 989. This title interest is referred to as the State's jus privatum interest.
¶ 19 Second, because such land is also held by the State in trust and for the benefit of the people, any right conveyed generally remains subservient to the public right to use water in place for navigation, see Hill v. Newell, 86 Wash. 227, 231, 149 P. 951 (1915), much like " 'a covenant running with the land.' " Orion, 109 Wash.2d at 640, 747 P.2d 1062 (quoting Scott W. Reed, The Public Trust Doctrine: Is it Amphibious?, 1 J. ENVTL. L. & LITIG. 107, 118 (1986) ). This public servitude is referred to as the State's jus publicum interest.
¶ 20 Although title to property burdened by the public trust remains continuously subject to the servitude, the competing rights and interests of the public and private owner rise and fall with the water. "As the level rises, the rights of the public to use the water increase since the area of water increases; correspondingly, the rights of the landowners decrease since they cannot use their property in such a manner as to interfere with the expanded public rights." Wilbour, 77 Wash.2d at 315, 462 P.2d 232. "As the level and the area of the water decreases, the rights of the public decrease and the rights of the landowners increase as the waters drain off their land, again giving them the right to exclusive possession until their lands are again submerged." Id.
¶ 21 A private landowner whose lands are burdened by the public trust cannot unilaterally extinguish the public right to use navigable waters in place by artificially elevating his or her property above the high-water mark absent legislative consent. Id. at 314-16, 462 P.2d 232. GBI contends the legislature and Washington voters consented to the retention of the Three Fingers fill when the legislature enacted and the people ratified the Savings Clause. We agree.
*262 I. The Legislature Consented to the Impairment of Navigable Waters by the Three Finger Fill When It Enacted the Savings Clause
¶ 22 The Savings Clause, RCW 90.58.270, provides legislative consent to the impairment of public trust rights by pre- Wilbour improvements and bars private actions challenging that impairment unless the improvements were "in trespass or in violation of state statutes." RCW 90.58.270(1), (2). GBI argues that because the Three Fingers fill was created pre- Wilbour, the Savings Clause protects the fill and bars this action. The Conservancy disagrees. It argues the Savings Clause is inapplicable in this case because the Three Fingers fill " 'obstruct[ed] or impede[d] ... the passage of [a] river, harbor, or collection of water' " in violation of the public nuisance statute. Suppl. Br. of Pet'r Conservancy at 17 (quoting RCW 7.48.140(3) ). According to the Conservancy, this violation of the public nuisance statute disqualifies the Three Fingers fill from the protections of the Savings Clause since the *556 fill was " 'in violation of state statutes' " at the time the Savings Clause was enacted. Id. at 3 (quoting RCW 90.58.270(1) ). GBI disagrees with the premise of the Conservancy's argument that the Three Fingers fill constitutes a public nuisance. To resolve this debate, we must construe the public nuisance statute as it relates to the Savings Clause.[4]
¶ 23 "Issues of statutory construction ... are questions of law" subject to de novo review. State v. Evans, 177 Wash.2d 186, 191, 298 P.3d 724 (2013). However, because we are dealing with a public trust impairment, albeit one *263 passed directly by the people, the statute must be strictly construed in preservation of the public trust interest absent express contrary language or necessary implication. See Hill, 86 Wash. at 229, 149 P. 951 (" 'The general rule of construction applying to grants of public lands by a sovereignty to corporations or individuals is that the grant must be construed liberally as to the grantor and strictly as to the grantee, and that nothing shall be taken to pass by implication.' " (quoting 26 AMERICAN AND ENGLISH ENCYCLOPAEDIA OF LAW 425 (2d ed. 1904) ) ); City of Berkeley v. Superior Ct., 26 Cal.3d 515, 528, 606 P.2d 362, 162 Cal.Rptr. 327 (1980) ("[S]tatutes purporting to abandon the public trust are to be strictly construed; the intent to abandon must be clearly expressed or necessarily implied; and if any interpretation of the statute is reasonably possible which would retain the public's interest in tidelands, the court must give the statute such an interpretation.").
¶ 24 RCW 7.48.140(3) declares it a public nuisance, among other enumerated actions, "[t]o obstruct or impede, without legal authority, the passage of any river, harbor, or collection of water." (Emphasis added.) Another statute further explains that "[n]othing which is done or maintained under the express authority of a statute [ ] can be deemed a nuisance." RCW 7.48.160 (emphasis added). GBI and the State interpret the Savings Clause as providing the requisite legal and express statutory authority for the retention and maintenance of pre- Wilbour improvements on navigable waterways and thereby insulating them from any public nuisance claim based on that same impairment of navigable waters. We agree.
¶ 25 The Savings Clause provides legislative "consent and authorization" "to the impairment of public rights of navigation, and corollary rights incidental thereto, caused by the retention and maintenance of" "structures, improvements, docks, fills, or developments placed in navigable waters prior *264 to December 4, 1969." RCW 90.58.270(1).[5] The only way for the Savings Clause to have any practical effect is to interpret it as giving pre- Wilbour improvements the requisite legal *557 and statutory authority to impair navigable waters so they no longer violate the public nuisance statute. Otherwise, prior consent would be a necessary prerequisite for obtaining post hoc consent under the Savings Clause. That reading is absurd and renders the entire statute practically meaningless; we therefore avoid it. State v. Riles, 135 Wash.2d 326, 340, 957 P.2d 655 (1998) ("Courts should not construe statutes to render any language superfluous and must avoid strained or absurd interpretations." (citing Wright v. Engum, 124 Wash.2d 343, 351-52, 878 P.2d 1198 (1994) ) ). Worse, such a reading would require us to construe the statute's limited proviso exception so broadly that it swallows the general rule entirely. Wash. State Legislature v. Lowry, 131 Wash.2d 309, 327, 931 P.2d 885 (1997) (Provisos " 'should be strictly construed with any doubt to be resolved in favor of the general provisions, rather than the exceptions.' " (quoting State v. Wright, 84 Wash.2d 645, 652, 529 P.2d 453 (1974) ) ). *265 ¶ 26 The legislature undeniably intended the Savings Clause to foreclose private actions for the removal of pre- Wilbour improvements based on their impairment of navigable waters alone. As one of the prime sponsors of the statute, Senator Gissberg, explained during a senate floor debate, the purpose of the Savings Clause was to "make[ ] legal any fills that took place prior to December 4, 1969," which is the date Wilbour was decided. 1 SENATE JOURNAL at 1411. Senator Gissberg further explained the reasoning for and the intended effect of the Savings Clause as follows:
Yes, I think in the entire section in subsection [ (1)[6] ], you are, the state of Washington is giving its consent to the impairment of public rights of navigation as to those structures, improvements, docks, fills or developments which were placed in navigable waters prior to December 4, 1969. And it is a savings clause for those structures that were placed there prior to Wilbour vs. Gallagher. If it is not there, then every dock, most of industry in the state that is on the water, of course, is there illegally and subject to mandatory injunction to being removed by anyone that wants to bring the lawsuit. Consequently, that is why the savings clause is there, and the state is giving, or purports to give its consent to the impairment of the navigable rights of the public generally which are impeded by the construction of those docks and facilities that are in navigable waters.
Id. We therefore interpret the Savings Clause as authorizing the retention and maintenance of the Three Fingers fill and barring private public nuisance claims based on the fill's impairment of navigable waters.[7] Unless that legislative *266 authorization itself violates the public trust doctrine, the Conservancy's claims for the removal of the Three Fingers fill based on the fill's impairment of navigable waters must be dismissed.
¶ 27 But before we can consider whether legislative consent to the Three Fingers fill was consistent with the legislature's public trust obligations, we must first address GBI's assertion that judicial review of the Savings Clause is precluded by legislative preemption.
II. Legislation That Impairs Public Trust Rights Is Subject to Judicial Review
¶ 28 GBI argues that since legislative action preempts the common law, it follows *558 that the SMA and its corresponding Savings Clause should preempt Washington's common law public trust doctrine and preclude judicial review as well. We disagree. While GBI correctly identifies the doctrine's common law origin, it overlooks the doctrine's constitutional footing.
As we have explained, the public trust doctrine is "partially encapsulated" in article 17 of our state constitution. Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 232, 858 P.2d 232 (1993). Because of the doctrine's constitutional underpinning, any legislation that impairs the public trust remains subject to judicial review. This includes the SMA. "Holding otherwise [would] elevate [ ] an exercise of the legislative power above the constitution, which is anathema to our system of law." Freedom Found. v. Gregoire, 178 Wash.2d 686, 706, 310 P.3d 1252 (citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803) ). While we have at times described the SMA as embodying the common law public trust rights, e.g., *267 Portage Bay-Roanoke Park Cmty. Council v. Shorelines Hr'gs Bd., 92 Wash.2d 1, 4, 593 P.2d 151 (1979), we have always embraced our constitutional responsibility to review challenged legislation, including legislation encompassed by the SMA, to determine whether that legislation comports with the State's public trust obligations. Caminiti, 107 Wash.2d at 670, 732 P.2d 989. We decline to abdicate that responsibility now.
¶ 29 The fact that the State never acquired title ownership to the Three Fingers property under article 17 does not mean the public trust doctrine has no constitutional force as to this property. As previously mentioned, article 17 recognized two distinct interests: the State's responsibility to protect Washington's public trust interests and the State's title ownership in specific lands. See id. at 666-67, 732 P.2d 989. Therefore, any legislative act arguably in dereliction of the State's constitutional responsibility to protect the public trust interest is subject to judicial review regardless of article 17 title ownership.
¶ 30 This leads us to the parties' primary dispute: Did the legislature violate the public trust doctrine when it enacted the Savings Clause?
III. Savings Clause Does Not Violate the Public Trust Doctrine
¶ 31 When evaluating a public trust claim, we generally use the Caminiti test, which considers: "(1) whether the State, by the questioned legislation, has given up its right of control over the jus publicum and (2) if so, whether by so doing the State (a) has promoted the interests of the public in the jus publicum, or (b) has not substantially impaired it." 107 Wash.2d at 670, 732 P.2d 989.
¶ 32 Both parties request that we apply the Caminiti test and uphold the Savings Clause, but they disagree about how the Savings Clause affects the public's ability to challenge individual fills under the public trust doctrine. The State insists we apply Caminiti in a jurisdiction-wide approach and prohibit any private public trust actions involving pre- *268 Wilbour fills. While the State's approach protects the Savings Clause, secures the settled property interests of Washington residents against repeat upheaval, and ensures industry and trade can continue uninterrupted, that approach requires us to uphold the impairment of what could be a significant amount of navigable waters (the parties dispute how much property would be subject to removal absent the Savings Clause's protections) under a test meant to protect the public's jus publicum interest from just this type of legislative action. Caminiti was supposed to be a judicial check on the legislature, not automatic consent.[8] Yet, no party is asking that we hold the Savings Clause invalid either.
¶ 33 The problem with applying the Caminiti test to legislation regarding historical fills is that the test does not adequately account for the legislation's unique circumstances. For that reason, the Conservancy insists we allow it to pursue an as-applied *559 challenge so it can ensure all bodies of water are protected without unearthing all pre- Wilbour fills. But allowing the Conservancy and other members of the public to pursue piecemeal, as-applied challenges means that all historical fills could at any time be subject to public trust litigation, which is exactly what the Savings Clause is intended to prevent. Many lands once submerged but now filled with a city or township erected upon them could fail scrutiny under Caminiti and be subject to abatement. The fact that the filling of navigable waters for the development of a similar city or township now should fail public trust scrutiny does not mean historical cities and towns must be demolished and abated as a result. Again, none of the parties want this, and neither did Washington voters when they overwhelmingly voted for the enactment of the Savings Clause.[9] *269 ¶ 34 As discussed earlier, the legislature enacted the Savings Clause in response to our decision in Wilbour. The Wilbour decision had a significant effect on land titles throughout Washington not because it ushered in a new rule (the public trust doctrine had already been recognized), but because it awoke the doctrine from a decades-long slumber. See Caminiti, 107 Wash.2d at 670, 732 P.2d 989 ("Although not always clearly labeled or articulated as such ... the doctrine has always existed in the State of Washington." (citing Johnson & Cooney, supra, at 285-87) ). Following the doctrine's awakening, the legislature grappled with the possibility that the long-settled property expectations of Washington residents and businesses who had relied on legislative encouragement in building homes and investing significant resources in the improvement of Washington's shorelands and tidelands could be upended by public trust claims. Sturtevant, 76 Wash. at 171, 135 P. 1035 ; 1 Senate Journal at 1411 (explaining "most of industry in the state that is on the water ... is there illegally and subject to mandatory injunction to being removed by anyone that wants to bring the lawsuit"). Indeed, Washington's then governor Evans was so concerned about color of title in these properties that he placed a statewide moratorium on all tideland fill projects, which slowed Washington's economy. See Orion, 109 Wash.2d at 627, 747 P.2d 1062. The legislature quickly responded with a single piece of legislation, the Savings Clause, which cleared title to all properties clouded by Wilbour and restored the economy. See 1 Senate Journal at 1411.
¶ 35 The Caminiti test does not adequately account for the special circumstances leading to the development of these fills, the awakening of the public trust doctrine from judicial slumber, and the critical need for settled property titles in these fills for Washington's economy, resident companies, *270 and private citizens. For these reasons, we decline to apply it in this case.[10]
¶ 36 The Savings Clause was designed to swiftly and decisively preserve property titles while reinforcing the state's commitment to protecting public trust interests. Other states have responded to the issue of historical fills similarly. Maine responded by enacting legislation that granted all fills a 30-year easement to protect them temporarily from public trust claims. Op. of Justices, 437 A.2d 597, 599 (Me. 1981). When that temporary easement proved inadequate, Maine sought a permanent solution and enacted a single bill to release all filled lands from any public trust servitude. See id. The California Supreme Court took a similar approach and extinguished the public trust interest over all historical fills in a single opinion. Berkeley, 26 Cal. 3d at 534-35, 162 Cal.Rptr. 327, 606 P.2d 362. This is essentially what our state *560 legislature did, with the approval of Washington voters, in enacting the Savings Clause.
¶ 37 We hold the Saving Clause does not violate the public trust doctrine. The Caminiti test simply does not apply and remains unchanged as a result.[11] As we previously suggested in another case, the resolution of title to historical fills alone could be sufficient to remove such property completely from public trust protections. See Orion, 109 Wash.2d at 640 n.9, 747 P.2d 1062 (explaining how in California properties *271 already dredged and filled based on earlier land grants were no longer subject to the trust (citing City of Berkeley, 26 Cal. 3d 515, 162 Cal.Rptr. 327, 606 P.2d 362 ) ). Statewide restoration of the entire shore and all tidelands is not a realistic option. Even the Conservancy-an environmental protection group-recognizes it would be too disruptive for us to undo all historical fills, hence its insistence on pursing a limited, as-applied challenge. Suppl. Br. of Pet'r Conservancy at 13 ("This case ... is a site-specific claim."); Pet'r Conservancy's Answer to Resp'ts' Mots. for Recons. at 3 ("[Conservancy] did not bring a facial challenge."), 7-8 ("[Conservancy] challenged the Savings Clause under the public trust doctrine as applied ").[12]
IV. The Conservancy Had Standing To Raise Its Public Nuisance Claim Based on a Public Trust Violation
¶ 38 Finally, we address GBI's challenge to the Conservancy's standing to raise a public trust claim (though that claim is not legally viable, as explained above). GBI classifies this action as a public nuisance action and argues the Conservancy has failed to allege the Three Fingers fill is "specially injurious" to its members as is statutorily required under RCW 7.48.210.[13] The Conservancy denies it is raising a public nuisance claim. Instead, the Conservancy describes this action as a public trust action distinct from a public nuisance action. Both parties are partially correct in that this is a public nuisance action based on an alleged breach of the public trust doctrine.
*272 ¶ 39 There are many types of public nuisance actions, including actions to remove an animal carcass or an impediment on a river or highway and actions to abate pollution or the manufacture of dangerous chemicals near businesses. RCW 7.48.140. An action seeking the removal of an impediment on a waterway because it interferes with the public's right to use that waterway is simply a specific type of public nuisance action. RCW 7.48.140(3). "Where the state has not approved impairment of state sovereign resources, private encroachment upon public use of the resources is treated as a public nuisance." 2 WATERS AND WATER RIGHTS § 30.02(c) at 30-35 (Amy K. Kelley ed., 3d ed. 2013). GBI is therefore correct that a plaintiff must be "specially injur[ed]" in order to have standing to raise a public trust claim, but that requirement is not a particularly high bar.
¶ 40 Although RCW 7.48.210 requires the plaintiff be "specially injur[ed]," it does not indicate the injury needed to satisfy that requirement is more demanding or exacting *561 than the injury needed for noneconomic standing generally. For an organization to have standing to raise noneconomic injuries, it must allege an " 'injury in fact.' " Save a Valuable Env't v. City of Bothell, 89 Wash.2d 862, 866, 576 P.2d 401 (1978) ( SAVE ) (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 722, 93 S.Ct. 2405, 37 L.Ed. 2d 254 (1973) (White, J., dissenting in part) ). That means the organization "must show that it or one of its members will be specifically and perceptibly harmed by the action." Id. (citing SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 ). An interest that is only speculative or indirect is not enough. Id. at 867, 576 P.2d 401 (citing Warth v. Seldin, 422 U.S. 490, 514, 95 S.Ct. 2197, 45 L.Ed. 2d 343 (1975) ). Thus, in the absence of a statutory definition, we will treat "specially injurious" harms needed for public nuisance claims the same as "specific and perceptible" "injuries in fact" needed for noneconomic claims.
¶ 41 Injury to the aesthetic appeal and environment of an area is sufficient to support standing if the plaintiff establishes that he or she uses that area for recreational *273 purposes. Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S.Ct. 1361, 31 L.Ed. 2d 636 (1972). The Conservancy satisfies that showing. Its members claim, with detail, that they are recreational users of Lake Chelan and that the Three Fingers fill obstructs their desire and right to use navigable waters over the property during the lake's high-water season.
¶ 42 We hold the harms alleged by the Conservancy's members are sufficiently distinct from the general public to satisfy the standing requirements of RCW 7.48.210. Moreover, that the Conservancy's members have never been able to use the lake waters over GBI's property despite their desire to do so shows their injury is real, not just speculative.
¶ 43 Contrary to GBI's arguments, neither Lampa v. Graham nor Kemp v. Putnam support its claim that the Conservancy lacks standing. Lampa v. Graham, 179 Wash. 184, 36 P.2d 543 (1934) ; Kemp v. Putnam, 47 Wash.2d 530, 288 P.2d 837 (1955), overruled on other grounds by SAVE, 89 Wash.2d at 867 n.1, 576 P.2d 401. In Lampa, we held a fisherman would have standing to challenge the construction of a wing dam on a river channel if the dam harmed his fishing activities along that channel, but later opined that he would not have standing if his sole claim was an interference with his right to navigate along the channel since that injury would be the same as the injury sustained by the public generally. 179 Wash. at 186, 36 P.2d 543. We, however, later clarified the Lampa decision was fact specific. Kemp, 47 Wash.2d at 535-36, 288 P.2d 837. After Lampa, we held in Kemp that a person who regularly engages in recreational fishing in a stream would have standing to challenge the unlawful obstruction of that stream. Id. at 536, 288 P.2d 837.
CONCLUSION
¶ 44 The Conservancy seeks the abatement of fill material GBI added to its property to elevate it above the waters of Lake Chelan because the increased property elevation obstructs the public right to use navigable waters in place over that property. We hold the Conservancy has standing *274 to bring this claim and conclude the legislature expressly consented to the fill's impairment of navigable waters when it enacted, with the approval of Washington voters, the Savings Clause, RCW 90.58.270. We further hold that consent by the legislature and the Washington voters did not violate the public trust doctrine. We therefore affirm.
WE CONCUR:
Fairhurst, C.J.
Owen, J.
McCloud, J.
Yu, J.

This opinion replaces the court's previously filed, but now withdrawn, opinion that was filed on July 6, 2017. Order on Mots. for Recons., No. 93381-2 (Wash. Nov. 13, 2017), https://www.courts.wa.gov/opinions/pdf/933812.pdf (unanimously withdrawing prior opinion).

We decline to address GBI'S defense of laches, which it raised for the first time in its briefs before this court. Supp'l Br. for Resp't GBI Holding Co. at 12 n.13; Answer to Amicus Curiae Br. of Center for Envt'l Law & Policy at 19 n.9; see Cummins v. Lewis County, 156 Wash.2d 844, 851, 133 P.3d 458 (2006) ("It is a well-established maxim that this court will generally not address arguments raised for the first time in a supplemental brief and not made originally by the petitioner or respondent within the petition for review or the response to the petition." (citing Douglas v. Freeman, 117 Wash.2d 242, 258, 814 P.2d 1160 (1991) ) ).

The Conservancy also asserted a trespass claim that is not at issue in this appeal. Chelan Basin Conservancy v. GBI Holding Co., 194 Wash.App. 478, 484 n.1, 378 P.3d 222, review granted, 186 Wash.2d 1032, 385 P.3d 769 (2016).

The city of Chelan believes we can avoid this public nuisance question. The city contends that since the Savings Clause consents only to the " 'retention and maintenance' " of existing structures, such consent does not extend to GBI's proposed 2010 developments, which in its view should end our analysis. Supp'l Br. of City of Chelan at 5-7 (quoting RCW 90.58.270(1) ). The city misapprehends the Conservancy's claims. Although this litigation was triggered by GBI's development proposals, those proposals do not form the bases of the Conservancy's complaint. The Conservancy seeks the removal of the existing fill, not an injunction against future development. We therefore cannot avoid the public nuisance question, as the city suggests.

RCW 90.58.270 provides in relevant part:
(1) Nothing in this section shall constitute authority for requiring or ordering the removal of any structures, improvements, docks, fills, or developments placed in navigable waters prior to December 4, 1969, and the consent and authorization of the state of Washington to the impairment of public rights of navigation, and corollary rights incidental thereto, caused by the retention and maintenance of said structures, improvements, docks, fills or developments are hereby granted: PROVIDED, That the consent herein given shall not relate to any structures, improvements, docks, fills, or developments placed on tidelands, shorelands, or beds underlying said waters which are in trespass or in violation of state statutes.
(2) Nothing in this section shall be construed as altering or abridging any private right of action, other than a private right which is based upon the impairment of public rights consented to in subsection (1) of this section.
(3) Nothing in this section shall be construed as altering or abridging the authority of the state or local governments to suppress or abate nuisances or to abate pollution.
(4) Subsection (1) of this section shall apply to any case pending in the courts of this state on June 1, 1971 relating to the removal of structures, improvements, docks, fills, or developments based on the impairment of public navigational rights.

According to the Senate Journal, the senator said "subsection (3)," but that reference must have been a mistake or scrivener's error because subsection (3) addresses the authority of state and local governments to bring nuisance and abatement actions notwithstanding the legislative consent provided in subsection (1). See Laws of 1971, 1st Ex. Sess., ch. 286, § 27.

We decline to address whether the Three Fingers fill is abatable as a public nuisance for reasons other than its impairment of navigable waters because that issue is not before us. The Conservancy has expressly disavowed bringing a public nuisance claim based on any reason other than the public trust. Chelan Basin, 194 Wash.App. at 492, 378 P.3d 222 ; Supp'l Br. of Pet'r Conservancy at 20 ("[T]his case was not brought as a nuisance action."). Nor has the Conservancy presented any facts that would trigger the application of Grundy v. Thurston County. 155 Wash.2d 1, 7 n.5, 117 P.3d 1089 (2005) (" '[E]ven though an act or a structure was lawful when made or erected, if for any reason it later becomes or causes a nuisance, the legitimate character of its origin does not justify its continuance as a nuisance.' " (footnote omitted) (quoting 66 C.J.S. Nuisances § 15, at 551-52 (1998) ) ).

The issue in Caminiti was a facial challenge against the State's authority to waive leasehold fees for private docks on state waters. 107 Wash.2d at 664-65, 732 P.2d 989. No specific dock or body of water was at issue. Id. at 665, 732 P.2d 989.

The concurrence is critical of the majority for using an analysis not raised by the parties and in the next breath argues that we could decide the current case based on laches-even though the parties did not raise that argument either. See concurrence at 564.

The concurrence takes issue with our analysis and asserts that we should follow the Caminiti test, which we have historically applied to public trust actions, and not decide this case by judicial fiat. Concurrence at 561-62. This creative argument ignores the fact that the test we have historically used is one which we created in 1987 by judicial fiat after the SMA. See Caminiti, 107 Wash.2d at 670, 732 P.2d 989. This argument also ignores that the Caminiti test does not address the unique aspects of historical fills. Instead, the concurrence would have us force the facts of this case into a test created for a narrower purpose.

The concurrence contends that with this opinion we have overturned Caminiti as incorrect and harmful. Concurrence at 563. We have done no such thing. Determining that a test does not apply to a particular case does not accordingly mean a rejection or abrogation of that test. Nor have we extinguished the public trust interests over all fills within the Savings Clause. The public trust remains in place for fills that are in trespass or in violation of state statutes. RCW 90.58.270(1). The concurrence's hypotheticals concerning fills built between 1970 and 1975 and advice as to what the State may do if fills within the Savings Clause change in degree or character are just speculation.

Because we do not apply the Caminiti test in this case, we do not address the parties' dispute over who has the burden of proving a public trust violation. We, however, note that Washington courts have generally treated public trust claims as constitutional challenges in presuming the constitutionality of the challenged legislation and placing the burden on the challenging party to prove otherwise. E.g., Chelan Basin, 194 Wash.App. at 494, 378 P.3d 222 ; Samson v. City of Bainbridge Island, 149 Wash.App. 33, 58, 202 P.3d 334 (2009) ; Citizens for Responsible Wildlife Mgmt. v. State, 124 Wash.App. 566, 570, 103 P.3d 203 (2004) ; Wash. State Geoduck Harvest Ass'n v. Dep't of Nat. Res., 124 Wash.App. 441, 447, 101 P.3d 891 (2004).

RCW 7.48.210 provides, "A private person may maintain a civil action for a public nuisance, if it is specially injurious to himself or herself but not otherwise."